John W. GARRELTS and Judith
K. Garrelts, Plaintiffs,

v.

SMITHKLINE BEECHAM CORP., d/b/a/
SmithKline Beecham Animal
Products, Defendant.

No. C 95–3081–MWB.

United States District Court,
N.D. Iowa,
Central Division.

Oct. 29, 1996.

John G. Martens of Sanderson, Ridout & Martens, Estherville, IA, for plaintiffs Garrelts.

Scott A. Smith of Popham, Haik, Schnobrich & Kaufman, Ltd., Minneapolis, MN, and Margaret M. Prahl of Heidman, Redmond, Fredregill, Patterson, Schatz & Plaza, L.L.P., Sioux City, IA, for defendant SBC.

## MEMORANDUM OPINION AND ORDER REGARDING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

BENNETT, District Judge.

## TABLE OF CONTENTS

I. INTRODUCTION AND BACKGROUND ................................... 1028

II. STANDARDS FOR SUMMARY JUDGMENT .............................. 1029

III. FINDINGS OF FACT ............................................. 1030

IV. LEGAL ANALYSIS ................................................ 1032
 A. Preemption Doctrine .......................................... 1032
 1. "Statutory" preemption ..................................... 1032
 a. "Flavors" of statutory preemption ....................... 1033
 b. Congressional intent ................................... 1034
 c. The presumption against preemption ..................... 1034
 2. "Agency" or "regulatory" preemption ........................ 1036
 a. Source and legitimacy .................................. 1036
 b. Nature of the agency preemption inquiry ................. 1036
 i. The agency's intent to preempt state law ............. 1038
 ii. The agency's authority to preempt state law ......... 1038
 c. Deference to agency determinations to preempt state law .. 1040
 i. The City of New York analysis ....................... 1042
 ii. The applicability of Chevron ........................ 1044
 iii. The continued relevance of congressional intent ..... 1047
 iv. Agency accountability ............................... 1048
 v. The presumption against preemption .................. 1050
 B. The Preemptive Effect of APHIS Regulations .................. 1051
 1. Prior decisions ............................................ 1051
 a. Lynnbrook Farms ....................................... 1051

 b. Other decisions ............................................1055
 2. This court's preemption analysis .....................................1057
 a. APHIS's intent to preempt ......................................1057
 b. Congressional authorization .....................................1060
 c. Are the Garrelts' claims preempted? ............................1069
 C. Certification For Interlocutory Appeal ................................1070

V. CONCLUSION ...............................................................1071

Defendant's motion for summary judgment in this products liability action involving a cattle vaccine poses the question of whether certain state tort claims are barred by federal "agency" or "regulatory" preemption, as distinct from federal "statutory" preemption. Thus, not only does the scope of preemption here involve questions of federalism and supremacy among sovereigns, it also involves the still more complicated questions that arise when an agency, a delegatee of Congress, not Congress itself, exercises, or is asserted to be exercising, supreme federal power. These questions involve the judiciary in an intricate dance between fulfilling its role as a co-equal branch of government charged with reviewing the exercise of federal power and the deference the judiciary is nonetheless supposed to accord most federal agency interpretations of congressional acts. In other words, what is at stake here, in this court's view, is both the concrete question of whether a particular individual has a remedy for alleged wrongs, and the abstract question of the constitutional scope of an agency's power to determine its own jurisdiction.

In their complaint, plaintiffs allege that they suffered injuries when one of them accidentally inoculated himself with a veterinary vaccine for cattle manufactured by the defendant. The defendant has moved for summary judgment, asserting that the plaintiffs' state-law claims are preempted by federal agency regulations. At its most basic level, the question raised by defendant's motion for summary judgment, therefore, is whether

regulations promulgated by a federal agency pursuant to the Virus–Serum–Toxin Act (VSTA), 21 U.S.C. §§ 151–159, preempt plaintiffs' state tort claims, because plaintiffs' claims are allegedly premised on inadequate labeling of a product whose label had been approved by the agency under its regulations.

## I. INTRODUCTION AND BACKGROUND

Plaintiffs John W. Garrelts and Judith K. Garrelts filed their complaint in this action on October 11, 1995, against defendant SmithKline Beecham Corporation d/b/a SmithKline Beecham Animal Products (SBC). Subject matter jurisdiction is based on diversity of citizenship and sufficient amount in controversy. *See* 28 U.S.C. § 1332. The Garrelts allege that John suffered injuries when he accidentally inoculated himself with SBC's Ultrabac 7 vaccine for cattle. The Garrelts allege that SBC's Ultrabac 7 vaccine was defective in that product labeling on the vaccine failed to warn against certain alleged dangers to humans in the event of accidental injection with the vaccine. SBC answered the complaint on December 13, 1995, denying, in the first instance, that its vaccine caused any injuries to the plaintiffs, and further asserting seven affirmative defenses.[1]

SBC filed a motion for summary judgment on May 10, 1996, seeking dismissal of the

---

**1.** SBC's affirmative defenses are the following: the complaint fails to state a claim upon which relief can be granted; plaintiffs were contributorily or comparatively at fault; plaintiffs' injuries, if any, were caused by third parties beyond SBC's control; plaintiffs' claims are barred by the "learned intermediary" doctrine; plaintiffs' injuries, if any, were caused by the foreseeable or unforeseeable misuse of the product at issue; the product was designed, manufactured, tested, marketed, advertised, and sold in full conformity with applicable state-of-the-art at the time and in the region; and, finally, plaintiffs' claims are preempted by federal law, specifically, VSTA and regulations promulgated pursuant to VSTA.

Garrelts' state-law claims on the ground that these claims are preempted by regulations promulgated pursuant to the Virus–Serum–Toxin Act (VSTA), 21 U.S.C. §§ 151–159, by the Animal and Plant Health Inspection Service (APHIS) of the United States Department of Agriculture (USDA). Specifically, SBC contends that the Garrelts' state tort claims are premised upon allegedly inadequate labeling, but that such claims are preempted by APHIS regulations, because the claims would impose requirements different from or in addition to those imposed by APHIS. SBC contends that APHIS has declared its intention to preempt state tort causes of action, and that APHIS's decision is reasonable and within the authority granted to it by Congress. The present motion for summary judgment therefore involves the issue of "agency" or "regulatory" preemption, as distinct from the more familiar issue of "statutory" preemption. Furthermore, the court finds but little authority from the Eighth Circuit Court of Appeals concerning agency preemption, as well as little authority from any jurisdiction on the question of the propriety of APHIS's preemption of state tort actions. However, the court recognizes, as do the parties, that almost all of the courts to consider whether APHIS's regulations properly preempt state tort actions have found the agency's regulations did properly preempt the state tort claims presented.[2]

The Garrelts resisted the motion for summary judgment on July 9, 1996. In essence, the Garrelts argue that the federal agency regulations do not preempt their state tort causes of action, because APHIS either did not intend, or was not authorized, to preempt causes of action based on injury to *humans.* In a reply brief filed July 19, 1996, SBC argues to the contrary, asserting that APHIS's intent and authority to preempt state tort·causes of action sweep broadly enough to encompass the·Garrelts' claims.

The court held oral arguments on SBC's motion for summary judgment on August 7, 1996. At the oral arguments, the Garrelts were represented by counsel John G. Martens of *Sanderson, Ridout & Martens,* in Estherville, Iowa. Defendant SBC was represented by counsel Scott A. Smith[3] of *Popham, Haik, Schnobrich & Kaufman, Ltd.,* in Minneapolis, Minnesota, and Margaret M. Prahl of *Heidman, Redmond, Fredregill, Patterson, Schatz & Plaza, L.L.P.,* in Sioux City, Iowa. The parties have filed thorough and extensive briefs in support of their respective positions, and have supplemented those briefs from time to time with recent decisions involving identical issues. This matter is now deemed fully submitted.

## II. STANDARDS FOR SUMMARY JUDGMENT

The Eighth Circuit Court of Appeals recognizes "that summary judgment is a drastic remedy and must be exercised with extreme care to prevent taking genuine issues of fact away from juries." *Wabun–Inini v. Sessions,* 900 F.2d 1234, 1238 (8th Cir.1990). On the other hand, the Federal Rules of Civil Procedure have authorized for nearly 60 years "motions for summary judgment upon proper showings of the lack of a genuine, triable issue of material fact." *Celotex Corp. v. Catrett,* 477 U.S. 317, 327, 106 S.Ct. 2548, 2555, 91 L.Ed.2d 265 (1986). Thus, "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Wabun–*

---

**2.** The exceptions are a decision of the United States District Court for the Northern District of Georgia, *Gresham v. Boehringer Ingelheim Animal Health, Inc.,* No. 1:95–cv–3376–ODE, 1996 WL 751126 (N.D.Ga. Aug. 7, 1996), and the unpublished decision of the United States District Court for the District of Minnesota in *Stegmaier v. SmithKline Beecham Animal Health, Inc.,* No. 4–95–cv–149, 1996 WL 755721 (D.Minn. Aug. 22, 1996). These decisions were submitted to the court through the diligence of the parties, the *Gresham* decision by the plaintiffs

in a supplement to their brief filed on August 29, 1996, and the *Stegmaier* decision by the defendant in a letter dated September 9, 1996. These decisions, as well as others involving the preemptive effect of APHIS regulations, will be considered in more detail *infra.*

**3.** The court pressed Mr. Smith quite hard at the oral arguments on this matter, and the court was impressed with his courtesy, professionalism, responsiveness to questions, obvious preparation, and able arguments on behalf of his client.

*Inini,* 900 F.2d at 1238 (quoting *Celotex,* 477 U.S. at 327, 106 S.Ct. at 2555); *Hartnagel v. Norman,* 953 F.2d 394, 396 (8th Cir.1992).

The standard for granting summary judgment is well established. Rule 56 of the Federal Rules of Civil Procedure states in pertinent part:

> Rule 56. Summary Judgment
>
> (b) For Defending Party. A party against whom a claim ... is asserted ... may, at any time, move for summary judgment in the party's favor as to all or any part thereof.
>
> (c) Motions and Proceedings Thereon.... *The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.*

*Fed.R.Civ.P.* 56(b) & (c) (emphasis added); *see also Celotex,* 477 U.S. at 322–23, 106 S.Ct. at 2552–53; *Reliance Ins. Co. v. Shenandoah South, Inc.,* 81 F.3d 789, 791 (8th Cir.1996); *Beyerbach v. Sears,* 49 F.3d 1324, 1325 (8th Cir.1995); *Munz v. Michael,* 28 F.3d 795, 798 (8th Cir.1994); *Roth v. U.S.S. Great Lakes Fleet, Inc.,* 25 F.3d 707, 708 (8th Cir.1994); *Cole v. Bone,* 993 F.2d 1328, 1331 (8th Cir. 1993); *Woodsmith Publishing Co. v. Meredith Corp.,* 904 F.2d 1244, 1247 (8th Cir. 1990); *Wabun–Inini,* 900 F.2d at 1238 (citing *Fed.R.Civ.P.* 56(c)). Ordinarily, analysis of a motion for summary judgment focuses on whether there are genuine issues of material fact that preclude summary judgment in the movant's favor,[4] and instead require submission of the case to a trier of fact. *See, e.g., Celotex,* 477 U.S. at 323, 106 S.Ct. at 2552–53 (if the nonmoving party fails to make a sufficient showing of an essential element of a claim with respect to which it has the burden of proof, then the moving party is "entitled to judgment as a matter of law."); *Woodsmith,* 904 F.2d at 1247 (same). However, in the present case, the parties agree, for the purpose of disposition of the summary judgment motion, that there are no facts in dispute. Thus, the analysis in this case focuses on the final clause of the quoted portion of Rule 56(c), that is, whether *"the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P.* 56(c) (emphasis added).[5]

## III. FINDINGS OF FACT

Again, for the purpose of the court's consideration of this motion for summary judgment only, defendant SBC concedes that the court should accept as true the material allegations contained in the Garrelts' complaint. Thus, solely for the purposes of this summary judgment motion, the court finds the following facts to be undisputed.

Plaintiff John W. Garrelts is a farmer in Palo Alto County, Iowa.[6] John raises cattle on his farm. John sometimes vaccinates his own cattle and calves, and on May 28, 1994, he was doing just that. John had purchased Ultrabac 7 vaccine, which is manufactured by SBC,[7] from Dr. Roger Larson, d/b/a the Clay

---

**4.** An issue of material fact is genuine if it has a real basis in the record. *Hartnagel,* 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586–87, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986)). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986); *Beyerbach,* 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

**5.** The court has considered in some detail the standards applicable to disposition of a motion for summary judgment when factual disputes are asserted to be material, most recently in *Jones Distrib. Co., Inc. v. White Consol. Indus., Inc.,* 943 F.Supp. 1445, 1451–54 (N.D.Iowa 1996);

*Valentine v. American Home Shield Corp.,* 939 F.Supp. 1376, 1380–83 (N.D.Iowa 1996); *Hanson v. Hancock County Mem. Hosp.,* 938 F.Supp. 1419, 1425–28 (N.D.Iowa 1996); and *Coulter v. CIGNA Property & Cas. Cos.,* 934 F.Supp. 1101, 1106–07 (N.D.Iowa 1996).

**6.** The complaint in this case, erroneously designated a "petition at law," does not disclose plaintiff Judith K. Garrelts' relationship to plaintiff John W. Garrelts.

**7.** The Garrelts alleged the name of the vaccine John used to be "Ultra–Vac Seven." *See, e.g.,* Complaint, ¶ 5. In its answer, SBC asserted that it manufactures no vaccine by that name, although it does manufacture one called "Ultrabac 7." For the purposes of this summary judgment

County Veterinary Clinic. While vaccinating a young calf, John accidentally inoculated himself with the Ultrabac 7 vaccine when the calf suddenly moved. John became ill following the inoculation and was subsequently taken by ambulance to the hospital. As a result of his accidental inoculation with Ultrabac 7 vaccine, John has suffered serious injuries, allegedly including continuing disability.[8]

The label on the Ultrabac 7 vaccine container did not contain a telephone number or other means of contacting SBC in the event of accidental human inoculation with the Ultrabac 7 vaccine. The label on the Ultrabac 7 vaccine did not warn of the possible danger to humans in the event of accidental inoculation with the vaccine, nor did the label instruct on the procedures to be taken in order to avoid self-inoculation. At the time of John's accidental inoculation with the Ultrabac 7 vaccine, SBC knew that accidental inoculations of humans with veterinary vaccines were occurring. Furthermore, SBC knew that humans may be seriously injured or killed if they are accidentally inoculated with the Ultrabac 7 vaccine.

In addition to these pertinent facts alleged in the complaint, and recognized as undisputed for the purposes of this summary judgment motion, SBC asserts that certain other facts are also undisputed. The Garrelts have not specifically challenged any of these facts in their resistance to SBC's motion for summary judgment, nor have they asserted that any additional facts are either undisputed or disputed.

SBC's additional undisputed facts are therefore as follows. Ultrabac 7 was licensed by APHIS for use on animals on May 30, 1980, under USDA License No. 225, Code 7410.00. Through the licensing process and through post-licensing testing and evaluation, Ultrabac 7 has been determined by APHIS to satisfy all requirements for purity, safety, potency, and efficacy contained in the APHIS standards. Furthermore, the vaccine has been designed, manufactured, and tested pursuant to APHIS standards and APHIS has approved the content and sufficiency of all design, manufacturing, and testing data submitted prior to licensing of the vaccine. In addition, the text, layout, and design of all labeling on the vaccine, including the packaging and product inserts, were specifically approved in writing by APHIS.

On December 6, 1995, following the decision of the Minnesota Court of Appeals in *Brandt v. Marshall Animal Clinic*, 540 N.W.2d 870 (Minn.Ct.App.1995), United States Senator Paul Wellstone of Minnesota wrote to APHIS requesting that APHIS clarify whether APHIS intended its regulations to preempt state tort claims arising out of the use of licensed animal vaccines.[9] On December 22, 1995, APHIS responded to Senator Wellstone's inquiry by way of a letter signed by Terry L. Medley, the Acting Administrator of APHIS.[10] In Medley's letter, he indicated APHIS's intent to preempt state requirements related to vaccines. Medley's letter states, in pertinent part, the following:

> Thank you for your letter of December 6, 1995, on behalf of your constituents Randy and Patty Brandt of Marshall, Minnesota, concerning their lawsuit against a USDA licensed manufacturer of veterinary biological products. Your letter requested a written clarification of the scope of our preemption of State law under the Virus–Serum–Toxin Act (VSTA), 21 U.S.C. 151, *et seq.*
>
> On October 19, 1990, we published a proposed rule in the *Federal Register* (55 FR 42392). The purpose of the proposed

---

motion, the parties do not appear to dispute the identity of the vaccine in question as Ultrabac 7 or that it was manufactured by SBC.

**8.** The Garrelts have since clarified that John's injuries allegedly include joint problems similar to arthritis and anaphylactoid reactions, such as anaphylactic shock. The nature of John's specific injuries is not at issue in these summary judgment proceedings. It is, however, undisputed that the injuries underlying the Garrelts' complaint are for physical injuries to *John,* not to John's cattle or to John for economic loss from injury to or death of his cattle.

**9.** Senator Wellstone's letter to APHIS is attached to the Affidavit of Scott A. Smith (docket no. 19) as Exhibit A.

**10.** APHIS's response to Senator Wellstone's letter is attached to Scott A. Smith's Affidavit as Exhibit B.

rule was to clarify our regulations with respect to State restrictions on the use and distribution of veterinary biological products and to specify how a person could request that Federal restrictions be imposed on such products.

On August 27, 1992, we published our final rule (57 FR 38758). A copy of that rule is enclosed for your information. We stated in that rule that in order to maintain uniform national standards regarding veterinary biological products (including labeling), States are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product. We promulgated this rule in response to regulatory actions by certain States which attempted to impose requirements concerning USDA licensed veterinary biological products which were different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product.

Our intent in promulgating the rule was, and continues to be, to preempt States from imposing requirements either through statutes, regulations, or other means that are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product. Such requirements would include, but are not limited to production, testing, distribution, or labeling requirements. We did not intend to preempt state common law actions for damages arising from noncompliance with USDA regulatory standards.

Defendant's Exhibit 1 to Affidavit of Smith, Letter from Medley to Wellstone (hereinafter, "Medley Letter").

Because the facts are not in dispute, the disposition of SBC's motion for summary judgment turns not on whether there are genuine issues of material fact, but whether, in light of the undisputed facts, SBC is entitled to judgment as a matter of law on the relatively narrow issue of whether the Gar-

relts' claims are preempted by APHIS regulations. The court therefore turns to its legal analysis of the issue raised by SBC's motion for summary judgment.

## IV. LEGAL ANALYSIS

### A. Preemption Doctrine

The Supremacy Clause of the United States Constitution states that "This Constitution, and the Laws of the United States which shall be made in Pursuance thereof ... shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. CONST. art. VI, cl. 2. This clause of the Constitution has given birth to the familiar, though not uncomplicated, doctrine of "statutory" preemption. *See New York State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins.*, — U.S. —, —, 115 S.Ct. 1671, 1676, 131 L.Ed.2d 695 (1995) (Supremacy Clause gives rise to doctrine of federal preemption); *CSX Transp., Inc. v. Easterwood*, 507 U.S. 658, 663, 113 S.Ct. 1732, 1737, 123 L.Ed.2d 387 (1993) (citing the Supremacy Clause as the basis for implied preemption of state law by a federal statute); *Hillsborough County v. Automated Med. Labs., Inc.*, 471 U.S. 707, 712–13, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985) ("It is familiar and well-established principle the Supremacy Clause ... invalidates state laws that 'interfere with, or are contrary to,' federal law."); *Kinley Corp. v. Iowa Utilities Bd.*, 999 F.2d 354, 357 (8th Cir.1993) (also finding authority for congressional acts to preempt state law in the Supremacy Clause, U.S. CONST., Art. VI, cl. 2). The court begins its analysis with the doctrine of "statutory" preemption, then turns to consideration of the doctrine of "agency" preemption.[11]

### I. "Statutory" preemption

 "Statutory" preemption is the child of congressional authority, found in the Supremacy Clause of the U.S. Constitution, and congressional action, embodied in enactment

---

11. The present lawsuit does not involve a question of "statutory" preemption. Nonetheless, the court begins its analysis with statutory preemption in order to compare and contrast the analy-

sis of a "statutory" preemption question with the analysis of an "agency" preemption question. The court's reasons for indulging in such a comparison will become evident *infra*.

of a statute. *See, e.g., New York State Conference of Blue Cross,* —— U.S. at ——, 115 S.Ct. at 1676 (the Supreme Court's "past cases have recognized that the Supremacy Clause, U.S. CONST., Art. VI, may entail preemption of state law" by a law enacted by Congress). When Congress has expressly preempted state law, the courts must " 'identify the domain expressly pre-empted' " by the express preemption language. *Medtronic, Inc. v. Lohr,* —— U.S. ——, ——, 116 S.Ct. 2240, 2250, 135 L.Ed.2d 700 (1996) (quoting *Cipollone v. Liggett Group, Inc.,* 505 U.S. 504, 517, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407 (1992)). Analysis of the scope of express preemption begins with the text, but interpretation of the language "does not occur in a contextual vacuum." *Id.* (citing *Gade v. National Solid Wastes Management Ass'n,* 505 U.S. 88, 111, 112 S.Ct. 2374, 2389–90, 120 L.Ed.2d 73 (1992) (Kennedy, J., concurring in part and concurring in the judgment)).

■ While determination of the scope of express preemption does not occur in a contextual vacuum, context is the key to a determination of the existence and scope of implied preemption. Generally, federal statutory law can preempt state law without an express statement by Congress when the federal statute implies an intention to preempt state law or when state law directly conflicts with federal law. *Van Bergen v. State of Minn.,* 59 F.3d 1541, 1548 (8th Cir. 1995) (citing *New York State Conference of Blue Cross,* —— U.S. at ——, 115 S.Ct. at 1676; *Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1722, 75 L.Ed.2d 752 (1983)).

### a. "Flavors" of statutory preemption

■ The Eighth Circuit Court of Appeals has therefore observed that "[p]reemption traditionally comes in four 'flavors' ":

(1) "express preemption," resulting from an express Congressional directive ousting state law (*Morales v. Trans World Airlines, Inc.,* [504] U.S. [374], 112 S.Ct. 2031, 119 L.Ed.2d 157 (1992); (2) "implied preemption," resulting from an inference that Congress intended to oust state law in

order to achieve its objective (*Hines v. Davidowitz,* 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1941); (3) "conflict preemption," resulting from the operation of the Supremacy Clause when federal and state law actually conflict, even when Congress says nothing about it (*Florida Lime & Avocado Growers, Inc. v. Paul,* 373 U.S. 132, 143, 83 S.Ct. 1210, 1218, 10 L.Ed.2d 248 (1963); and (4) "field preemption," resulting from a determination that Congress intended to remove an entire area from state regulatory authority (*Fidelity Fed. Savs. & Loan Ass'n v. de la Cuesta,* 458 U.S. 141, 153, 102 S.Ct. 3014, 3022, 73 L.Ed.2d 664 (1982)). *See Pacific Gas & Elec. Co. v. State Energy Resources Conservation & Dev. Comm'n,* 461 U.S. 190, 203–04, 103 S.Ct. 1713, 1721–22, 75 L.Ed.2d 752 (1983); *see generally,* Burt Neuborn, *An overview of Preemption* (Fed. Jud. Center, Feb. 9, 1993).

*Kinley,* 999 F.2d at 358 n. 3; *accord New York State Conference of Blue Cross,* —— U.S. at ——, 115 S.Ct. at 1676 (preemption of state law occurs "either by express provision, by implication, or by a conflict between federal and state law"); *Freightliner Corp. v. Myrick,* —— U.S. ——, ——, 115 S.Ct. 1483, 1487, 131 L.Ed.2d 385 (1995) (considering "express" preemption, as well as "implicit" preemption shown by an intent for federal law to "occupy the field exclusively" or from "actual conflict" of state law with federal law, or where it is "impossible for a private party to comply with both state and federal requirements," or where state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," and concluding that a court may consider whether some provisions of a federal statute impliedly preempt state law even where the statute contains an express preemption clause applicable to certain areas); *CSX Transp., Inc.,* 507 U.S. at 663, 113 S.Ct. at 1737 ("Where a state statute conflicts with, or frustrates, federal law, the former must give way."); *Cipollone,* 505 U.S. at 516, 112 S.Ct. at 2617 (preemption may be "explicitly stated in the statute's language or implicitly contained in its structure and purpose," and, where not made explicit, results where state

law "actually conflicts" with federal law, or where federal law "so thoroughly occupies a legislative field" as to leave no room for state law to supplement it); *Hillsborough County,* 471 U.S. at 713, 105 S.Ct. at 2375 (identifying "express" preemption, and implied preemption, which arises where Congress "left no room" for supplementary state regulation, where a federal interest is "dominant," where state law conflicts with federal law, such as where compliance with both federal and state law is impossible, and where state law "stands as an obstacle" to the purposes and objectives of Congress); *Van Bergen,* 59 F.3d at 1548 (court considers whether Congress has "occupied the field" of regulation, as well as whether the state law is in actual conflict with the federal law.); *Burlington N.R.R. Co. v. State of Minnesota,* 882 F.2d 1349, 1352 (8th Cir.1989) (same).

■ Thus, federal law preempts state law not only where the two are plainly contradictory, but also where " 'the incompatibility between [them] is discernible only through inference.' " *Hankins v. Finnel,* 964 F.2d 853, 861 (8th Cir.1992) (quoting *Hayfield Northern R.R. Co. v. Chicago & N.W. Transp. Co.,* 467 U.S. 622, 627, 104 S.Ct. 2610, 2614, 81 L.Ed.2d 527 (1984)), *cert. denied sub nom. Missouri v. Hankins,* 506 U.S. 1013, 113 S.Ct. 635, 121 L.Ed.2d 566 (1992). To put it another way, "[p]reemption ... will arise when 'state law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress.' " *Id.* (quoting *Schneidewind v. ANR Pipeline Co.,* 485 U.S. 293, 300, 108 S.Ct. 1145, 1150–51, 99 L.Ed.2d 316 (1988), in turn citing *Hines,* 312 U.S. at 67, 61 S.Ct. at 404); *see also Silkwood v. Kerr–McGee Corp.,* 464 U.S. 238, 248, 104 S.Ct. 615, 621, 78 L.Ed.2d 443 (1984) (preemption occurs when "it is impossible to comply with both state and federal law," or "state law stands as an obstacle to the accomplishment of the full purposes and objectives of Congress."); *Kinley,* 999 F.2d at 357 (the Supremacy Clause " 'invalidates state laws that "interfere with, or are contrary to," federal law,' " quoting *Hillsborough County v. Automated Med. Labs., Inc.,* 471 U.S. 707, 712, 105 S.Ct. 2371, 2375, 85 L.Ed.2d 714 (1985)).

### b. Congressional intent

■ Congressional intent is the critical question in a statutory preemption analysis. *Kinley,* 999 F.2d at 357 (citing *Louisiana Pub. Serv. Comm'n v. FCC,* 476 U.S. 355, 369, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986)); *accord New York State Conference of Blue Cross,* —— U.S. at ——, 115 S.Ct. at 1676 ("pre-emption claims turn on Congress's intent"). As the Supreme Court has more recently reiterated the maxim, " '[t]he purpose of Congress is the ultimate touchstone' in every preemption case.' " *Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2250 (quoting *Retail Clerks Int'l Ass'n, Local 1625, AFL–CIO v. Schermerhorn,* 375 U.S. 96, 103, 84 S.Ct. 219, 223, 11 L.Ed.2d 179 (1963)); *Cipollone,* 505 U.S. at 516, 112 S.Ct. at 2617 (also recognizing this "touchstone" of preemption analysis). Thus, "any understanding of the scope of a pre-emption statute must rest primarily on 'a fair understanding of congressional purpose.' " *Id.* (quoting *Cipollone,* 505 U.S. at 530 n. 27, 112 S.Ct. at 2624 n. 27 (opinion of Stevens, J.)). In determining congressional purpose, the Supreme Court looks to the "language of the pre-emption statute," its surrounding "statutory framework," and "the structure and purpose of the statute as a whole." *Id.* at ——, 116 S.Ct. at 2251 (internal citations and quotations omitted).

### c. The presumption against preemption

■ Because congressional intent is the critical question in a statutory preemption analysis, the analysis of statutory preemption begins with a presumption:

[B]ecause the States are independent sovereigns in our federal system, we have long presumed that Congress does not cavalierly pre-empt state-law causes of action. In all preemption cases, and particularly in those in which Congress has "legislated in a field which the States have traditionally occupied," *Rice v. Santa Fe Elevator Corp.,* 331 U.S. 218, 230, 67 S.Ct. 1146, 1152, 91 L.Ed. 1447 (1947), we "start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of

Congress." *Id.,* at 230, 67 S.Ct., at 1152; *Hillsborough Cty.,* 471 U.S., at 715–716, 105 S.Ct., at 2376; *cf. Fort Halifax Packing Co. v. Coyne,* 482 U.S. 1, 22, 107 S.Ct. 2211, 2223, 96 L.Ed.2d 1 (1987).

*Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2250; *see also New York State Conference of Blue Cross,* —— U.S. at ——, 115 S.Ct. at 1676 ("despite the variety of . . . opportunities for federal preeminence," including the various "flavors" of preemption described above, the Supreme Court "ha[s] never assumed lightly that Congress has derogated state regulation, but instead ha[s] addressed claims of pre-emption with the starting presumption that Congress does not intend to supplant state law," citing *Maryland v. Louisiana,* 451 U.S. 725, 746, 101 S.Ct. 2114, 2128–29, 68 L.Ed.2d 576 (1981)). Indeed, this presumption is a recurring theme in the Supreme Court's discussions of preemption. *See New York State Conference of Blue Cross,* —— U.S. at ——, 115 S.Ct. at 1676–77 ("[I]n cases . . . where federal law is said to bar state action in fields of traditional state regulation, *see Hillsborough County v. Automated Medical Labs., Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985), we have worked on the 'assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress,'" quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152, and also citing *Cipollone,* 505 U.S. at 516, 112 S.Ct. at 2617; *id.* at 532–33, 112 S.Ct. at 2625–26 (Blackmun, J., concurring in part, concurring in judgment in part, and dissenting in part); *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 740, 105 S.Ct. 2380, 2389, 85 L.Ed.2d 728 (1985); *Jones v. Rath Packing Co.,* 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977); *Napier v. Atlantic Coast Line R. Co.,* 272 U.S. 605, 611, 47 S.Ct. 207, 209, 71 L.Ed. 432 (1926)); *CSX Transp., Inc.,* 507 U.S. at 663–64, 113 S.Ct. at 1737 ("In the interest of avoiding unintended encroachment on the authority of the States . . . a court interpreting a federal statute pertaining to a subject traditionally governed by state law will be reluctant to find preemption. Thus, pre-emption will not lie unless it is 'the clear and manifest purpose of

Congress,'" quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152).

In *Medtronic,* the Supreme Court identified matters that fall within the historic police powers of the states:

> Throughout our history the several States have exercised their police powers to protect the health and safety of their citizens. Because these are "primarily, and historically, . . . matter[s] of local concern," *Hillsborough County v. Automated Medical Laboratories, Inc.,* 471 U.S. 707, 719, 105 S.Ct. 2371, 2378, 85 L.Ed.2d 714 (1985), the "States traditionally have had great latitude under their police powers to legislate as to the protection of the lives, limbs, health, comfort, and quiet of all persons." *Metropolitan Life Ins. Co. v. Massachusetts,* 471 U.S. 724, 756, 105 S.Ct. 2380, 2398, 85 L.Ed.2d 728 (1985) (internal quotation marks omitted).

*Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2245.

In order to overcome the presumption against preemption with a sufficient showing of congressional intent to preempt state law, the Supreme Court begins by examining the text of the statutory provision in question, then moves on, if need be, to the structure and purpose of the Act in which the specific statutory provision occurs. *New York State Conference of Blue Cross,* —— U.S. at ——, 115 S.Ct. at 1677; *accord Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2251 (in determining congressional purpose, the Supreme Court looks to the "language of the preemption statute," its surrounding "statutory framework," and "the structure and purpose of the statute as a whole"); *CSX Transp., Inc.,* 507 U.S. at 664, 113 S.Ct. at 1737 ("Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue."). Thus, in *Medtronic, Inc.,* the Supreme Court examined not only the language of the statute, but its "basic purpose" and "legislative history." *Medtronic, Inc.,* —— U.S. at —— ——, 116 S.Ct. at 2252–53. The nature of "statutory" preemption and the analysis courts must bring to bear on an assertion of statutory preemption differ from the nature and analysis of questions of

"agency" preemption. The court must explore these differences in some detail.

### 2. *"Agency" or "regulatory" preemption*

"Agency" or "regulatory" preemption is the half sister of statutory preemption, born of congressional authority, but *agency* action.[12] The question presented here is whether this half sister is illegitimate, not in parentage, but in the scope it has been given by the agency parent, and indeed by a litigant asserting the preemptive effect of agency action, in the case of particular agency regulations.

#### a. *Source and legitimacy*

■■■ The legitimacy of agency preemption as a general principle has been conclusively determined. The phrase "Laws of the United States" in the Supremacy Clause, the Supreme Court has held, encompasses both federal statutes and statutorily authorized *federal regulations*. *City of New York v. FCC*, 486 U.S. 57, 63, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988); *Lynnbrook Farms v. SmithKline Beecham Corp.*, 79 F.3d 620, 623 (7th Cir.1996), *cert. denied,* — U.S. —, 117 S.Ct. 178, 136 L.Ed.2d 118 (1996); *Time Warner Cable v. Doyle*, 66 F.3d 867, 875 (7th Cir.1995), *cert. denied,* — U.S. —, 116 S.Ct. 974, 133 L.Ed.2d 894 (1996); *Freehold Cogeneration Assocs., L.P. v. Board of Reg. Comm'rs of N.J.*, 44 F.3d 1178, 1190 (3d Cir.1995), *cert. denied sub nom. N.J. Div. of Ratepayer Advocate v. Freehold Cogeneration Assocs., L.P.,* — U.S. —, 116 S.Ct. 68, 133 L.Ed.2d 29 (1995); *Murphy v. SmithKline Beecham Animal Health Group*, 898 F.Supp. 811, 814 (D.Kan.1995). Thus, in addition to the forms of "statutory" preemption described in the preceding subsection, the Supreme Court has repeatedly recognized "agency" preemption as a form of federal preemption of state law in which a federal agency, acting within its congressionally delegated authority, may preempt state law through a regulation or regulations. *City of New York v. FCC*, 486 U.S. at 63, 108 S.Ct.

at 1642 (" 'a federal agency acting within the scope of its congressionally delegated authority may pre-empt state regulation,' " quoting *Louisiana Pub. Serv. Comm'n, infra* ); *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986); *Hillsborough County*, 471 U.S. at 713, 105 S.Ct. at 2375 ("We have repeatedly held that state laws can be pre-empted by federal regulations as well as by federal statutes."); *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 699, 104 S.Ct. 2694, 2700, 81 L.Ed.2d 580 (1984) (" 'Federal regulations have no less pre-emptive effect than federal statutes,' " quoting *de la Cuesta, infra* ); *Fidelity Fed. Sav. and Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 152–54, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982) (the Court observed that "Federal regulations have no less pre-emptive effect than federal statutes," and the question is whether the regulation is within the agency's statutory authority); *Lynnbrook Farms*, 79 F.3d at 624; *Kansas ex rel. Todd v. United States*, 995 F.2d 1505, 1509 (10th Cir.1993) ("An agency's preemption regulations have no less preemptive effect than statutes," citing *de la Cuesta* ). Here, SBC relies solely upon the theory of agency preemption to support its motion for summary judgment. The burden of demonstrating preemption rests with SBC. *Silkwood v. Kerr–McGee, Corp.*, 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443 (1984).

#### b. *Nature of the agency preemption inquiry*

■■■ The Supreme Court has explained that the nature of the inquiry the court must pursue when "agency" preemption is at issue differs from that described above as applicable to the question of statutory preemption:

> [H]ere the inquiry becomes whether the federal agency has properly exercised its own delegated authority rather than sim-

12. The relationship between the two forms of preemption may actually be one step further removed, since "agency" preemption is not born directly of congressional authority drawn from the Supremacy Clause; rather, it is born of congressional authority *delegated* to an agency. *See*

*City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642 (recognizing that agency preemption is not based on Congress's proper exercise of legislative power, but upon the agency's "own delegated authority").

ply whether Congress has properly exercised the legislative power. Thus we have emphasized that in a situation where state law is claimed to be pre-empted by federal regulation, a "narrow focus on Congress' intent to supersede state law [is] misdirected," for "[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law." *Fidelity Federal Savings & Loan Assn v. De la Cuesta*, 458 U.S. 141, 154 [102 S.Ct. 3014, 3023, 73 L.Ed.2d 664] (1982). Instead, the correct focus is on the federal agency that seeks to displace state law and on the proper bounds of its lawful authority to undertake such action. The statutorily authorized regulations of an agency will pre-empt any state or local law that conflicts with such regulations or frustrates the purposes thereof. Beyond that, however, in proper circumstances the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area. *Crisp*, 467 U.S., at 700 [104 S.Ct. at 2701]; *De la Cuesta, supra*, at 152–154 [102 S.Ct. at 3022–3023]. It has long been recognized that many of the responsibilities conferred on federal agencies involve a broad grant of authority to reconcile conflicting policies. Where this is true, the Court has cautioned that even in the area of pre-emption, if the agency's choice to pre-empt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *United States v. Shimer*, 367 U.S. 374, 383 [81 S.Ct. 1554, 1560, 6 L.Ed.2d 908] (1961);

*see also Crisp, supra*, at 700 [104 S.Ct. at 2701].

*City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642.[13] Thus, the Supreme Court has employed a two-prong analysis of agency pre-emption, looking first to see if the agency intended to pre-empt state law, then examining "whether the [agency] is legally authorized to pre-empt state and local" law or regulation. *Id.* at 65–66, 108 S.Ct. at 1643; *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374, 106 S.Ct. at 1901 ("a federal agency may pre-empt state law only when and if it is acting within the scope of its congressionally delegated authority."); *de la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023 ("[T]he questions upon which resolution of this case rests are whether the [agency] meant to pre-empt [the state's] law, and, if so, whether that action is within the scope of the [agency's] delegated authority."); *Lynnbrook Farms*, 79 F.3d at 624 (describing this two-prong test as "whether the power to preempt is within the bounds of authority granted to the agency by Congress, and if so, whether the agency has acted on this authority," citing *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642); *Time Warner Cable*, 66 F.3d at 875–76 (quoting the statement of the two-prong test from *Louisiana Pub. Serv. Comm'n* and later as stated in *de la Cuesta* ); *Donmar Enter., Inc. v. Southern Nat'l Bank of N.C.*, 64 F.3d 944, 949 & n. 8 (4th Cir.1995) (the only question before the court was whether the agency had expressed pre-emptive intent, because there was "no question raised but that the regulation involved in this case was reasonable, authorized, and consistent with the underlying statute," citing *de la Cuesta* for the test); *First Gibraltar Bank, FSB v. Morales*, 19 F.3d 1032, 1040 (5th Cir.) ("In *de la Cuesta*, the Court made clear that cases of adminis-

**13.** The Eighth Circuit Court of Appeals has had little opportunity to pass upon the nature of the inquiry in an agency preemption case, or, for that matter, upon any other aspect of a claim of agency preemption. The Eighth Circuit Court of Appeals mentioned agency preemption in a quotation of a passage from *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986), in *Parten v. Consol. Freightways Corp.*, 923 F.2d 580, 582 (8th Cir.1991), but did not address that form of preemption in the case before it. Slightly earlier, in *Arkansas State Bank Comm'r v. RTC*, 911

F.2d 161 (8th Cir.1990), the Eighth Circuit Court of Appeals drew upon the passage quoted in the body of this opinion from *City of New York*, then concluded that there was "no infirmity" in the RTC's authority to preempt state banking laws without finding it necessary to address the question in detail. *Arkansas State Bank Comm'r*, 911 F.2d at 173. Thus, this court must rely on its own reading of Supreme Court precedent and the interpretations of the agency preemption doctrine by other federal courts in disposing of the present question of the preemptive force of an agency's regulations.

trative preemption require consideration of two questions: (1) did the agency intend to preempt the state law in question, and (2) if so, was that action within the scope of the agency's delegated authority?" citing *de la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023), *cert. denied*, —— U.S. ——, 115 S.Ct. 204, 130 L.Ed.2d 134 (1994), *vacated and superseded on other grounds*, 42 F.3d 895 (5th Cir.1995).

**i. The agency's intent to preempt state law.** As to the first prong of the analysis, whether the agency intended to preempt state law, the portion of *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642, quoted above demonstrates that agency preemption also comes in different "flavors." *Cf. Kinley*, 999 F.2d at 358 n. 3 (identifying the "flavors" of statutory preemption). One of these "flavors" is implied preemption, in which the Supreme Court has held that "[t]he statutorily authorized regulations of an agency will pre-empt any state or local law *that conflicts with such regulations or frustrates the purposes thereof.*" *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642; *Crisp*, 467 U.S. at 705–08, 104 S.Ct. at 2703–05 (examining the extent to which Oklahoma law conflicted with FCC regulations, thus demonstrating implied preemption of the state's law by the FCC). "Beyond that," the Supreme Court wrote, there is also express agency preemption, because "in proper circumstances the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area." *Id.*

■ Where an agency has explicitly stated its intent to exercise exclusive authority in an area and to preempt state and local regulation, the case "does not turn on whether there is an actual conflict between federal and state law ... or whether compliance with both federal and state standards would be physically impossible." *Id.* at 65–66, 108 S.Ct. at 1643 (citing *de la Cuesta*, 458 U.S. at 153, 102 S.Ct. at 3022). Where an agency has expressly stated an intent to preempt state law, preemption may be authorized even "where it is clearly possible for [a person] to comply with [state] standards in addition to the federal standards." *Id.* at 66, 108 S.Ct. at 1643.

However, where agency preemption is only implied, rather than express, the Court had previously observed that it was "even more reluctant to infer pre-emption from the comprehensiveness of regulations than from the comprehensiveness of statutes," because

[a]s a result of their specialized functions, agencies normally deal with problems in far more detail than does Congress. To infer pre-emption whenever an agency deals with a problem comprehensively is virtually tantamount to saying that whenever a federal agency decides to step into a field, its regulations will be exclusive. Such a rule, of course, would be inconsistent with the federal-state balance embodied in our Supremacy Clause jurisprudence.

*Hillsborough County*, 471 U.S. at 717, 105 S.Ct. at 2377. Thus, "if an agency does not speak to the question of pre-emption, [the Court] will pause before saying that the mere volume and complexity of its regulations indicate that the agency did in fact intend to preempt." *Id.* at 718, 105 S.Ct. at 2377.

■ **ii. The agency's authority to preempt state law.** As to the second prong of the analysis, whether the agency acted within its delegated authority, " '[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law.' " *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642 (quoting *de la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023); *Lynnbrook Farms*, 79 F.3d at 624 (citing *de la Cuesta*). Although no *express* congressional authorization is required, in *City of New York*, the Supreme Court reaffirmed its prior statement that there are at least two reasons why it is important to the determination of the agency preemption issue to discover whether the agency is acting within its congressionally delegated authority:

"First, an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it. Second, the best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Con-

gress to the agency." *Louisiana Public Service Comm'n*, 476 U.S., at 374 [106 S.Ct. at 1901].

*City of New York*, 486 U.S. at 66, 108 S.Ct. at 1643. Thus, congressional intent remains critical to the propriety of agency preemption in this second prong of the inquiry.[14] Some examples demonstrate how this prong of the analysis plays out.

In *City of New York*, in determining the nature and scope of the authority delegated by Congress to the agency in question, the Federal Communications Commission (FCC), the Court began by reviewing the background of federal preemption on the particular issue in question, local technical standards for cable television signal quality. *City of New York*, 486 U.S. at 66, 108 S.Ct. at 1643. Specifically, the Court found that the power granted to the FCC under the Cable Act "mirror[ed] the state of the regulatory law before the Cable Act was passed." *Id.* at 67, 108 S.Ct. at 1644. Because Congress did not indicate in the Cable Act that it explicitly disapproved of the FCC's decade of prior regulatory policy of preemption of local technical standards, the Court "doubt[ed] that Congress intended to overturn the Commission's decade-old policy without discussion or even any suggestion that it was doing so." *Id.* at 67–68, 108 S.Ct. at 1644. Instead, the Court found in the legislative history specific indications that Congress intended the FCC's policy of preemption to continue. *Id.* at 68, 108 S.Ct. at 1644. The Court therefore found "nothing in the Cable Act" that led it "to believe that the Commission's decision to pre-empt local technical standards governing the quality of cable signals 'is not one that Congress would have sanctioned.'" *Id.* at 69, 108 S.Ct. at 1645 (quoting *Shimer*, 367 U.S. at 383, 81 S.Ct. at 1560).

In *Crisp*, the Court found that FCC regulations were "consistent with [the agency's] congressionally defined charter." *Crisp*, 467 U.S. at 708, 104 S.Ct. at 2705. The Court looked to statutory language to find that Congress had authorized the FCC to "'make available, so far as possible, to all the people of the United States a rapid, efficient, Nation-wide and world-wide wire and radio communication service....'" *Id.* (quoting 47 U.S.C. § 151). The Court then concluded as follows:

> With that end in mind, the Commission has determined that only federal pre-emption of state and local regulation can assure cable systems the breathing space necessary to expand vigorously and provide a diverse range of program offerings to potential cable subscribers in all parts of the country. While that judgment may not enjoy universal support, it plainly represents a reasonable accommodation of competing policies committed to the FCC's care, and we see no reason to disturb the agency's judgment.

*Crisp*, 467 U.S. at 708, 104 S.Ct. at 2705. The Court therefore upheld the agency's preemptive regulations as within the authority delegated to the agency by Congress. *Id.*

Similarly, in *de la Cuesta*, the Court found that the Federal Home Loan Bank Board (FHLBB) had "plenary" authority to issue the regulations in question by looking at the broad scope of the language of the authorizing statute, which specified each of the areas in which challenged preemptive regulations had been promulgated, and determined that the regulations were within the agency's purview. *de la Cuesta*, 458 U.S. at 160–61, 102 S.Ct. at 3026. Congress had also specifically authorized the FHLBB to determine the

---

**14.** An accurate interpretation of the continued importance of congressional intent may be seen in *Kansas ex rel. Todd*, in which the Tenth Circuit Court of Appeals wrote the following:

> The first step in this preemption issue is to consider if Congress intended to supersede state law with the Federal Crop Insurance Act and its regulations. *Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 369, 106 S.Ct. 1890, 1898, 90 L.Ed.2d 369 (1986).... But this focus on Congress's intent is not so fixed

that it is dependent on "'express congressional authorization to displace state law.'" *[City of] New York v. FCC*, 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988).

*Kansas ex rel. Todd*, 995 F.2d at 1505. Congressional intent has not been expunged from the analysis, because an express congressional authorization is not required; rather, the question is whether Congress intended the agency to have preemptive power, despite its failure to say so expressly.

"best practices" to be applied in banking regulation. *Id.* at 161, 102 S.Ct. at 3026. The Court read this statutory language to "suggest[ ] that Congress expressly contemplated, and approved, the Board's promulgation of regulations superseding state law." *Id.* at 162, 102 S.Ct. at 3027. Furthermore, the Court found that the somewhat sparse legislative history confirmed its reading of the scope of Congress's authorization to the agency. *Id.* at 163–64, 102 S.Ct. at 3027–28.

By way of contrast, in *Louisiana Pub. Serv. Comm'n,* the Court found congressional authorization for the agency's action was not only lacking, but had been denied. *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 374, 106 S.Ct. at 1901–02. In such circumstances, the Court "simply [could] not accept an argument that the [agency] may nevertheless take action which it thinks will best effectuate federal policy" because "[a]n agency may not confer power upon itself." *Id.* The Court stated, "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do." *Id.* at 374–75, 102 S.Ct. at 1902. Furthermore, the Court rejected the argument that, in the face of a limitation on agency jurisdiction in the authorizing statute, agency preemption was saved by the agency's assertion that it "cannot help but preempt state . . . regulation . . . if it is to fulfill its statutory obligation." *Id.* at 375, 102 S.Ct. at 1902. The Court found that the statute instead contemplated dual regulation, because it established a mechanism for establishing "jurisdictional separation." *Id.*

### c. Deference to agency determinations to preempt state law

Courts have from time to time read into this agency preemption inquiry the same sort of deference accorded other agency interpretations, attempting to reconcile *City of New York* with *Chevron, U.S.A., Inc. v. Natural Resources Defense Council, Inc.,* 467 U.S. 837, 104 S.Ct. 2778, 81 L.Ed.2d 694 (1984). In *Chevron,* the Court held that if a statute is "silent or ambiguous with respect to the specific issue" in question, courts should accept "reasonable" administrative interpretations. *Chevron,* 467 U.S. at 843–44, 104 S.Ct. at 2782.[15] Thus, Judge Kravitch of the Eleventh Circuit Court of Appeals recently wrote,

There is . . . one further twist to *Chevron* deference: it may not be obvious that this court's obligation to defer to [an agency's] interpretations of [the statute it is charged with implementing] attaches even when those interpretations address the scope of preemption of state law by federal regulation. I recognize that the law may be unsettled in general as to the application of *Chevron* to an agency's determination of its own jurisdiction. *See generally* Cass R. Sunstein, Law and Administration After Chevron, 90 Colum.L.Rev. 2071, 2097–2101 (1990). Indeed, there is an inherent ten-

---

**15.** Pursuant to the *Chevron* standard of review for agency interpretations of statutes the agency is charged with implementing, when a court is confronted with an instance in which neither Congress nor the statute in question provides guidance to the court for resolution of the correct interpretation of terms of the statute, the court may not automatically impose its own interpretation of the statute; instead, the court must apply the interpretation of the agency, *provided* the agency's interpretation "is based on a permissible construction of the statute." *Chevron,* 467 U.S. at 843, 104 S.Ct. at 2782; *see also Pauley v. BethEnergy Mines, Inc.,* 501 U.S. 680, 696–97, 111 S.Ct. 2524, 2534, 115 L.Ed.2d 604 (1991); *Train v. Natural Resources Defense Council, Inc.,* 421 U.S. 60, 87, 95 S.Ct. 1470, 1485–86, 43 L.Ed.2d 731 (1975); *Udall v. Tallman,* 380 U.S. 1, 16–18, 85 S.Ct. 792, 801–02, 13 L.Ed.2d 616 (1965). Under *Chevron,* courts must accord the agency's interpretation considerable defer-

ence, and " 'should not disturb [that interpretation] unless it appears from the statute or the legislative history that the accommodation is not one that Congress would have sanctioned.' " *Chevron,* 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *United States v. Shimer,* 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)). Thus, the court will defer to the agency's interpretation if it is "rational and consistent with the statute." *NLRB v. United Food & Commercial Workers Union, Local 23, AFL–CIO,* 484 U.S. 112, 123, 108 S.Ct. 413, 421, 98 L.Ed.2d 429 (1987); *Chevron,* 467 U.S. at 842–44, 104 S.Ct. at 2781–82 (describing the review as a determination of whether the agency's interpretation is "reasonable"); *Arkansas AFL–CIO v. FCC,* 11 F.3d 1430, 1440–41 (8th Cir.1993) (*en banc* ) ("reasonableness" is standard of review, and if the agency's interpretation is "reasonable," the court "*cannot* replace the agency's judgment with [its] own.").

sion between *Chevron* deference, which only obtains where a statute is "silent or ambiguous," *Chevron*, 467 U.S. at 843, 104 S.Ct. at 2782, and preemption doctrine, which maintains that state law will not be preempted unless that is "the clear and manifest purpose of Congress," *Rice*, 331 U.S. at 230, 67 S.Ct. at 1152. So, to say that a court should defer to an agency's determination that state law is preempted is seemingly paradoxical: the agency would command deference under *Chevron* only if the federal statute is ambiguous; but if the federal statute were ambiguous, then Congress's intent to preempt seemingly would not be "clear and manifest." Furthermore, although separation of powers (or institutional competence) con-

cerns might counsel in favor of courts' deferring to agencies in the resolution of ambiguous questions of statutory interpretation, countervailing federalism concerns offset this rationale for *Chevron* deference in preemption cases. Although federal agencies are more democratically accountable than courts, state legislatures are arguably yet more politically accountable. In the abstract, then, it is not at all clear that a state's view that a federal statute does not preempt state law should give way to a federal agency's view that the statute does preempt.

*Teper v. Miller*, 82 F.3d 989, 997–98 (11th Cir.1996) (footnote omitted).[16] Judge

16. In the article to which Judge Kravitch refers, Professor Sunstein considered the question, "Does an agency have the authority to decide on its own jurisdiction?" and found that *"Chevron* does not say."* Cass R. Sunstein, *Law and Administration After Chevron*, 90 COLUM.L.REV. 2071, 2097 (1990) (hereinafter *"After Chevron"*). Professor Sunstein had these further, pungent observations:

In a few cases the Court appears to have deferred to agency decisions on questions that were at least plausibly jurisdictional. In a recent case, however, the Court said that while "agency determinations within the scope of delegated authority are entitled to deference," an agency " 'may not bootstrap itself into an area in which it has no jurisdiction.' " [*Adams Fruit Co. v. Barrett*, 494 U.S. 638, 650, 110 S.Ct. 1384, 1391, 108 L.Ed.2d 585 (1990) (quoting *Federal Maritime Comm'n v. Seatrain Lines, Inc.*, 411 U.S. 726, 745, 93 S.Ct. 1773, 1785, 36 L.Ed.2d 620 (1973).] The passage suggests that jurisdictional determinations will not receive deference. But it is somewhat ambiguous, and there is as yet no clear answer to this question.

Because congressional instructions are crucial here, courts should probably refuse to defer to agency decisions with respect to issues of jurisdiction—again, if we assume that the distinction between jurisdictional and nonjurisdictional questions is easily administrable. The principal reason is that Congress would be unlikely to want agencies to have the authority to decide on the extent of their own powers. To accord such power to agencies would be to allow them to be judges in their own cause, in which they are of course susceptible to bias. .... [I]t would have seemed exceedingly odd to suggest that [an agency] should be allowed to resolve ambiguities in a statute governing its own jurisdiction. The danger of bias and self-dealing is so great as to make [the agency] an interested party.

As Justice Scalia has emphasized, however, there would be some difficulty in administering the sometimes elusive distinction between jurisdictional and nonjurisdictional questions. [*Mississippi Power & Light v. Mississippi ex rel. Moore*, 487 U.S. 354, 377–84, 108 S.Ct. 2428, 2442–45, 101 L.Ed.2d 322 (1988) (Scalia, J., concurring) ]..... For these reasons, it would be at least plausible to suggest that a general rule of deference would be preferable even on jurisdictional questions, because of its greater ease of application and because the agency's competence bears on the resolution of jurisdictional ambiguities.

Sunstein, *After Chevron*, 90 COLUM.L.REV. at 2097–2100 (footnotes omitted). Professor Sunstein also proposed a solution to the question of when deference should apply to agency determinations of the agency's jurisdiction:

Probably the best reconciliation of the competing considerations of expertise, accountability, and partiality is to say that no deference will be accorded to the agency when the issue is whether the agency's authority extends to a broad area of regulation, or to a large category of cases, except to the extent that the answer to that question calls for determinations of fact and policy. On this approach, there is no magic in the word "jurisdiction." Instead, the question is whether the agency is seeking to extend its legal power to an entire category of cases, rather than disposing of certain cases in a certain way or acting in one or a few cases. This distinction is not always extremely sharp, and it will call for an exercise of judgment. But in the vast majority of cases, it is easily administered.

It should also follow that agencies will not receive deference when they are denying their authority to deal with a large category of cases. Here too the agency determination is jurisdictional. Here too there is a risk of bias, in the form not of self-dealing, but instead of an abdication of enforcement power. Because abdication has been a major legislative fear, and

Kravitch found that *City of New York* pointed the way out of this conundrum:

> Fortunately, I need not completely untangle this knotty issue of jurisprudence in order to conclude that the [agency's] interpretation [of the statute in question] is entitled to deference in this case. In *City of New York v. FCC*, a unanimous Court clarified the law sufficiently to settle the issue before us. . . .

*Teper*, 82 F.3d at 998. The Eleventh Circuit Court of Appeals interpreted the portion of *City of New York*, quoted above, in which the Court cautioned that courts should not disturb an agency's reasonable accommodation of conflicting policies unless that accommodation is not one that Congress would have sanctioned, to have the following import:

> An agency like the [Federal Election Commission (FEC)], to which Congress has delegated broad discretion in interpreting and administering a complex federal regulatory regime, is entitled to significant latitude when acting within its statutory authority, even in its decisions as to the scope of preemption of state law. *See also Fidelity Fed. Savings & Loan Ass'n v. de la Cuesta*, 458 U.S. 141, 151–55, 102 S.Ct. 3014, 3022–23, 73 L.Ed.2d 664 (1982). *But cf. Louisiana Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986) (overturning agency preemption determination without mention of *Chevron* deference). *In other words, even if a statute is on its face ambiguous, Congress's intent to preempt may be clear when the administrative agency expressly responsible for interpreting and implementing the statute has clarified it.*

*Teper*, 82 F.3d at 998 (emphasis added). This court simply cannot agree with such a reading of *City of New York*, because it expands deference to the agency far beyond the express parameters stated in *City of New York*.

Nor can the court agree with the analysis employed by the Seventh Circuit Court of Appeals in *Time Warner*, 66 F.3d at 876–82. Although the Seventh Circuit Court of Appeals initially stated the test of agency preemption in terms of the two prongs of the *City of New York* inquiry as stated above, thereafter *City of New York* entirely disappears from that court's analysis. *Id.* at 876. In its place, the court applied only *Chevron* deference to the FCC's interpretation of its power to preempt state regulation of "negative option billing." *Id.* Specifically, the court of appeals stated the decisive question as "whether the FCC reasonably concluded that it was authorized to undertake the preemption contained in its regulations." *Id.* at 877. However, under *City of New York*, the proper question is not whether an agency "reasonably concluded" it was authorized to undertake the preemption of state law by agency regulation, but "whether the [agency] is legally authorized to pre-empt state and local" law or regulation. *City of New York*, 486 U.S. at 66, 108 S.Ct. at 1643; *see also de la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023 (question in the second prong of the analysis is "whether the agency possessed the power" to preempt state law, not whether it reasonably thought it had such power).

In light of the silence of the Eighth Circuit Court of Appeals on the question of how courts must approach determinations of "agency" preemption and this court's specific disagreement with recent decisions of other circuit courts of appeals, this court must explain how it reads *City of New York* on the question of deference to any agency's determination of its power to preempt state law.

■ *i. The City of New York analysis.* This court finds that an attempt to reconcile *City of New York* with *Chevron* is simply misdirected, *contra Teper*, 82 F.3d at 998, and displacement of *City of New York* with a *Chevron* analysis is fundamentally flawed. *Contra Time Warner Cable*, 66 F.3d at 876. Instead, this court finds that *City of New York* suggests no deference as a matter of course in its two-prong analysis of agency preemption. In *City of New York*, and the cases upon which it relied, the Court made a searching inquiry to determine the *agency's* intent to preempt that differed little, if at all,

because deference doctrine should not contain an antiregulatory bias, *Chevron* should be inapplicable here as well.

Sunstein, *After Chevron*, 90 Colum.L.Rev. at 2100 (footnotes omitted).

from the inquiry the Court employed to determine whether *Congress* had shown a "manifest" intent to preempt state law. For example, in *City of New York*, the court examined the language of the preemptive regulations and the rule-making process for those regulations. *City of New York*, 486 U.S. at 65, 108 S.Ct. at 1642–43; *de la Cuesta*, 458 U.S. at 154–58, 102 S.Ct. at 3022–25 (finding the FHLBB's intent to preempt state banking regulation was "unambiguous" in light of the language of the agency's regulations and the published rule-making commentaries of the agency); *cf. Medtronic, Inc.*, — U.S. at — – —, 116 S.Ct. at 2252–53 (in a statutory preemption case, the Court examined the language of the statute, as well as its "basic purpose" and "legislative history."). In *City of New York*, the Court specifically examined the policy statement adopting the regulations as published by the agency at 50 Fed.Reg. 52464. *City of New York*, 486 U.S. at 65, 108 S.Ct. at 1643. The Court concluded, in light of the language of the regulations and their history, "In this case, there is no room for doubting that the [FCC] intended to pre-empt state technical standards governing the quality of cable television signals." *Id.* (also stating that the FCC "has explicitly stated its intent to exercise exclusive authority in this area and to pre-empt state and local regulation").

The Court then scrutinized whether the FCC had the authority from Congress to preempt state and local regulation, reiterating that " 'an agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it.' " *Id.* at 66, 108 S.Ct. at 1643 (quoting *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374, 106 S.Ct. at 1901). The Court found that Congress "sanctioned in relevant respects the regulatory scheme that the Commission had been following" for a decade by specifically mirroring the state of pre-existing regulatory law in the statute. *Id.* at 67, 108 S.Ct. at 1644. Instead of explicitly rejecting the FCC's regulatory posture, the legislative history indicated "a straightforward endorsement" of that regulatory posture. *Id.* at 68, 108 S.Ct. at 1644. Although the Court upheld the agency's determination to preempt

state law, nowhere in the course of its actual analysis of the agency preemption issue did the Court suggest that it should simply defer to the agency's determination *until* it considered the FCC's findings pertaining to policy questions. *Id.* at 69, 108 S.Ct. at 1644–45. Nowhere else in its analysis of whether the agency had the authority to preempt state law did the Court examine what the agency thought was the scope of its authority or examine the agency's interpretation of congressional statements. Deference to agency determinations only arose when the Court addressed the FCC's "explicit findings, based on considerable experience in this area, that complementary or additional technical standards set by state and local authorities do conflict with the basic objectives of federal policy with respect to cable television." *Id.* The Court found that arguments that local standards did not conflict with federal regulatory standards should be discounted, because the argument was contrary to the agency's determination on policy grounds. *Id.* The Court's complete analysis, including its determination that the policy matters at issue had been committed to the agency, led the Court to conclude that there was nothing in the statute to suggest that the agency's decision to preempt local standards was " 'not one that Congress would have sanctioned.' " *Id.* (quoting *Shimer*, 367 U.S. at 383, 81 S.Ct. at 1560).

This application of the two-prong analysis is in keeping with the language the Court used in describing the nature of the inquiry. "[I]n proper circumstances," the Court said, "the agency may determine that its authority is exclusive and pre-empts any state efforts to regulate in the forbidden area." *Id.* at 64, 108 S.Ct. at 1642. What the Eleventh Circuit Court of Appeals and other courts apparently missed, however, is that the Court then explained what those "proper circumstances" are. The Court identified those "proper circumstances" as circumstances that "involve a broad grant of authority *to reconcile conflicting policies.*" *Id.* Only where this is true does the Court accord the agency any deference in its determination of its power to preempt state law: "Where this is true, the Court has cautioned that even in

the area of pre-emption, if the agency's choice to pre-empt 'represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" *Id.* (quoting *Shimer,* 367 U.S. at 383, 81 S.Ct. at 1560). However, even in this narrow zone of deference, the Court's choice of language demonstrates that the agency's decision must still be found to accord with congressional intent to be sustained. *Id.*

Thus, under this court's reading of *City of New York,* deference to an agency's determination to preempt state law arises only in very narrow circumstances; specifically, it arises only where (1) Congress confers on the agency "a broad grant of authority to reconcile conflicting policies," *and* (2) the agency's choice to preempt "represents a *reasonable* accommodation *of conflicting policies that were committed to the agency's care by the statute." See City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642 (emphasis added). When both of these conditions have been met, and only then, should the court refrain from disturbing the agency's *reasonable* determination. *Id.* However, it appears from the Court's language that even an agency's *reasonable* determination of pre-·emption may be disturbed if "'it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.'" *Id.* (quoting *Shimer,* 367 U.S. at 383, 81 S.Ct. at 1560). Therefore, even when the conditions are met for according the agency deference, the agency's choice must be both (1) reasonable, and (2) one that Congress would have sanctioned, based on the statute and its legislative history, *i.e.,* one consistent with congressional intent. *Id.*

 *ii. The applicability of Chevron.* This court recognizes that such an interpretation of the Supreme Court's analysis of the inquiry in agency preemption cases runs counter to the general principle of judicial

deference to agency determinations articulated in *Chevron,* 467 U.S. at 842–43, 104 S.Ct. at 2781–82, and counter to the concerns of the Eleventh Circuit Court of Appeals about the applicability of *Chevron* to agency·preemption questions expressed in *Teper,* 82 F.3d at 998. However, this court's reading of *City of New York* is that *Chevron* is simply inapplicable.

This court believes that some of the confusion about the applicability of *Chevron* to an agency's determination of its power to preempt state regulation may have arisen because *Chevron* mirrors the deference language of the doctrine of agency preemption found in *Shimer,* the seminal Supreme Court decision on agency preemption. The Court in *Chevron* wrote that courts must accord considerable deference to an agency's interpretation of a statute it is charged with implementing, and "'should not disturb [the agency's interpretation] unless it ˙ appears from the statute or the legislative history that the accommodation is not one that Congress would have sanctioned.'" *Chevron,* 467 ˙U.S. at 845, 104 S.Ct. at 2783 (quoting *Shimer,* 367 U.S. at 383, 81 S.Ct. at 1560). However, two of the three Supreme Court decisions on agency preemption rendered after *Chevron, City of New York* and *Louisiana Pub. Serv. Comm'n,* do not even mention *Chevron's* deferential standard as applicable at all, let alone generally, to the question of agency preemption. In the third decision, *Hillsborough County,* the Court cited *Chevron* for the proposition that the agency's statement that it *did not* intend to preempt state law "is dispositive on the question of implicit intent to pre-empt unless ... the agency's position is inconsistent with clearly expressed congressional intent." *Hillsborough County,* 471 U.S. at 714–15, 105 S.Ct. at 2376 (citing *Chevron,* 467 U.S. at 842–45, 104 S.Ct. at 2781–83).[17] This lack of reliance on *Chevron* as stating a standard applicable to the question of whether an agency has properly decided to preempt state law, this court concludes, is because *Chevron* is simply *not* applicable to the question of agency preemp-

---

17. In *Hillsborough County,* the Court recognized that the agency's statement that it *did not* intend to preempt state law would also not be disposi-

tive if "subsequent developments reveal a change in that position." *Hillsborough County,* 471 U.S. at 715, 105 S.Ct. at 2376.

tion; instead, the standards applicable to agency preemption are fully stated in *City of New York*. Those standards, according to this court's reading of *City of New York*, accord deference to the agency's determination of preemption in only very narrow circumstances.[18]

Nor is *de la Cuesta*, an agency preemption decision rendered prior to *Chevron*, to the contrary, although it too may be the source of some confusion. In *de la Cuesta*, the Court recognized a similarity between review of the exercise of agency discretion and review of agency preemption in certain circumstances:

> Where Congress has directed an administrator to exercise his discretion, his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily. *United States v. Shimer*, 367 U.S. 374, 381–82 [81 S.Ct. 1554, 1560, 6 L.Ed.2d 908] (1961). When the administrator promulgates regulations intended to pre-empt state law, the court's inquiry is similarly limited:
>
> > "If [h]is choice represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *Id.*, at 383 [81 S.Ct. at 1560].

*de la Cuesta*, 458 U.S. at 153–54, 102 S.Ct. at 3022–23; *see also United States v. Vernon Home Health, Inc.*, 21 F.3d 693, 696 (5th Cir.) ("[W]hen the administrator promulgates regulations that preempt state law, the court's inquiry is limited to whether the regulations are reasonable, authorized, and consistent with the statute" citing *de la Cuesta*), *cert. denied*, —— U.S. ——, 115 S.Ct. 575, 130 L.Ed.2d 491 (1994). Two things are noteworthy about this comparison. First, the Court in the *de la Cuesta* decision *did not* establish a general rule that review of an agency's determination to preempt state law is limited to ascertaining whether the agency's decision was in excess of authority or arbitrary. *Compare Vernon Home Health, Inc.*, 21 F.3d at 696 (apparently reading *de la Cuesta* to establish just such a general rule of review). Rather, it established, or reaffirmed, that a *similar* sort of deference was to be accorded agency determinations to preempt state law in certain circumstances, *i.e.*, whether the action was "reasonable" and whether it was one that it appeared Congress would have sanctioned, when those circumstances are present. *Id.* at 154, 102 S.Ct. at 3023. However, *de la Cuesta* is in accord with this court's reading of *City of New York*, because this earlier decision also calls for deference to the agency's determination only in the narrow circumstances in which the agency's choice is a *"reasonable* accommodation of conflicting policies *that were committed to the agency's care by statute."* *de la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023 (quoting *Shimer*, 367 U.S. at 383, 81 S.Ct. at 1560, with emphasis added by this court); *and see City of New York*, 486 U.S. at 64; 108 S.Ct. at 1642 (also quoting *Shimer*); com-

---

**18.** This court's reading of *City of New York* might be borne out by the short shrift given an agency's assertion that it "cannot help but pre-empt state ... regulation ... if it is to fulfill its statutory obligation" in *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 375, 106 S.Ct. at 1902. Such a determination might ordinarily be accorded deference under *Chevron*, but, in the circumstances presented in *Louisiana Pub. Serv. Comm'n*, that decision could not be given deference under *Chevron* any more than it could be given deference under standards applicable to agency preemption, because the Court found the assertion contrary to the express intent of Congress, in light of Congress's formulation of a dual regulatory scheme in the statute. *Id.* at 376, 106 S.Ct. at 1902. Thus, the rejection of the argument in *Louisiana Pub. Serv. Comm'n* is in accord with principles of both agency preemption, as stated in *Shimer*, and similar principles in *Chevron* that were explicitly drawn from *Shimer*. *Compare Shimer*, 367 U.S. at 383, 81 S.Ct. at 1560 (an agency's accommodation of conflicting policies committed to its care will not be disturbed "unless ... the accommodation is not one that Congress would have sanctioned"), *with Chevron*, 467 U.S. at 845, 104 S.Ct. at 2783 (quoting *Shimer*). Therefore, as much as this court would like to be able to call upon *Louisiana Pub. Serv. Comm'n* as directly supporting its interpretation, it cannot do so in an intellectually honest manner. However, what *Louisiana Pub. Serv. Comm'n* does demonstrate is the limits of the zones of deference stated in *Chevron* and identified by this court in *City of New York*: those zones of deference end where conflict with congressional intent begins.

pare *Vernon Home Health, Inc.*, 21 F.3d at 696 (omitting this limitation from its statement of the rule for review of agency preemption).

In addition to the language used by the Court, the analysis used in *de la Cuesta* is also consistent with this court's reading of that decision and *City of New York*. In *de la Cuesta*, the Court determined that Congress had authorized the FHLBB to make the necessary resolutions of conflicting policy. *Id.* at 168, 102 S.Ct. at 3030. Thus, the FHLBB's preemption determinations came within the narrow zone of deference this court believes was intended in *City of New York*. In *de la Cuesta*, the Court observed that the wisdom of the FHLBB's policy decisions was "not uncontroverted," but also observed that "neither is it arbitrary or capricious." *Id.* at 169, 102 S.Ct. at 3030. This second reference to arbitrariness or capriciousness, however, is again a means of comparison to the standard by which *de la Cuesta* was ultimately decided. The standard on which the Court founded its holding was that the FHLBB "reasonably exercised the authority given it by Congress," having first determined that the agency's determination was within the zone of deference pertaining to accommodations of policies committed to the agency's care. *Id.* at 170, 102 S.Ct. at 3031.

Thus, this court cannot agree with the Fifth Circuit Court of Appeals, which stated,

Agency decisions to preempt state law· are entitled to judicial deference, and if an agency's choice to preempt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute, we should not disturb it unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *City of New York v. FCC*, 486 U.S. 57, 64, 108 S.Ct. 1637, 1642, 100 L.Ed.2d 48 (1988) (citing *United States v. Shimer*, 367 U.S. 374, 383, 81 S.Ct. 1554, 1560, 6 L.Ed.2d 908 (1961)).

*First Gibraltar Bank, FSB v. Morales*, 19 F.3d 1032, 1040 (5th Cir.), *cert. denied*, —— U.S. ——, 115 S.Ct. 204, 130 L.Ed.2d 134 (1994), *vacated and superseded on other grounds*, 42 F.3d 895 (5th Cir.1995).[19] Rather, in this court's view, the proper statement of the standard for review is as follows: Agency decisions to preempt state law are entitled to judicial deference *only* if an agency's choice to preempt "represents a reasonable accommodation of conflicting policies that were committed to the agency's care by the statute," and *when* such a situation exists, "we should not disturb [the agency's accommodation] unless it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned." *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642; *see also Feikema v. Texaco, Inc.*, 16 F.3d 1408, 1416 (4th Cir.1994) (stating that "even if an agency, rather than Congress, resolves to preempt an area, its determination will be enforced to preempt conflicting state regulations *so long as* the determination represents 'a reasonable accommodation of conflicting policies that are within the agency's domain,'" quoting *Crisp*, 467 U.S. at 700, 104 S.Ct. at 2701; emphasis added by this court). Thus, although the Tenth Circuit Court of Appeals attempted to reconcile *Chevron* with *City of New York* in *Kansas ex rel. Todd*, 995 F.2d at 1509, that court's reconciliation comes nearer what this court holds to be the proper reading of when any deference is applicable. In *Kansas ex rel. Todd*, the Tenth Circuit Court of Appeals applied deference to an agency determination, specifically citing *Chevron*, but only to the question of whether the agency had "reasonably exercised its authority given to it by Congress," not to the question of whether Congress had granted the agency such authority. *Kansas ex rel. Todd*, 995 F.2d at 1509. However, under this court's reading, this application of deference is still too general, because it does not limit deference only to situations in which Congress has authorized the agency to make accommodations of conflicting policies committed to the agency's care.

---

**19.** In the superseding opinion, the Fifth Circuit Court of Appeals reaffirmed its belief that the agency must be accorded deference in its interpretation of its authority to preempt *state law*. *First Gibraltar Bank, FSB*, 42 F.3d at 901.

There are three further reasons why this court concludes that the inquiry into agency preemption accords the agency no deference, except in the narrow circumstances of accommodation of policies committed to the agency by Congress. First, the intent of Congress has not been expunged from the analysis. Second, an assertion of an agency's greater accountability, as compared to that of courts, is unpersuasive. Finally, agency preemption is subject to the same presumption against preemption of state regulation of police, health, and safety matters as is statutory preemption. The court will consider each of these reasons briefly in turn.

■ *iii. The continued relevance of congressional intent.* One of the reasons this court concludes that an agency's determination to preempt state law is, as a general matter, entitled to no particular deference, is that congressional intent remains a critical part of the analysis, and, under *City of New York*, a determination of congressional intent is entirely a matter for the court, without deference to the agency. Furthermore, in making that judicial determination of congressional intent, the court does not look to the agency's interpretation of congressional expressions of its intent. *See City of New York*, 486 U.S. at 62–66, 108 S.Ct. at 1641–43 (making no reference to agency interpretation of congressional expressions of intent); *and compare Teper*, 82 F.3d at 998 (suggesting that the agency's interpretation of congressional intent to preempt should be given deference). In *de la Cuesta*, as in some of the Supreme Court's agency preemption decisions since, the Court observed that a court's "narrow focus on Congress' intent to supersede state law was misdirected." *de la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023; *see also City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642 (reiterating this proposition from *de la Cuesta*). In both *de la Cuesta* and *City of New York*, the Court's justification for widening the focus from congressional intent to other matters was that " '[a] preemptive regulation's force does not depend on express congressional authorization to displace state law.' " *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642 (quoting *de la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023). Instead, the preemptive force of a regulation

depends upon satisfaction of the two prongs of what this court has called the *City of New York* inquiry. *Id.; de la Cuesta*, 458 U.S. at 154, 102 S.Ct. at 3023 ("Rather, the questions upon which resolution of this case rests are whether the [agency] meant to pre-empt [a state's] law, and, if so, whether that action is within the scope of the [agency's] delegated authority.").

When the decisionmaker deciding whether or not to preempt state law is an agency, an entity one step removed from Congress itself, it of course makes sense that, in the first instance, a reviewing court should look at the agency's intent to preempt state law rather than at Congress's intent. The Supreme Court's decision in *Hillsborough County* demonstrates the efficacy of such an approach. In that decision, the agency decisionmaker had itself eschewed an intent to preempt state law. *Hillsborough County*, 471 U.S. at 714, 105 S.Ct. at 2375–76. A party seeking to establish that agency action was intended to preempt state law should face an "uphill battle" when the agency itself has expressly renounced such an intention. *Id.* To approach the analysis any other way moves the determination of preemption a further step away from Congress, into the hands of some litigant who is asserting that an agency, acting only on delegated authority from Congress, intended to preempt state law, when the agency itself may have eschewed such action. Nonetheless, shifting the focus in the first instance to the agency decisionmaker when agency preemption is at issue does not necessarily suggest any deference to that agency decisionmaker's preemption determination. More importantly, perhaps, such an initial shift in the focus does not suggest that congressional intent has been expunged from the analysis, only relegated, under the circumstances, to the second step.

Nonetheless, that second step of the analysis remains critical. The Supreme Court has specifically postulated the importance of the second prong of the agency preemption analysis in part on what it shows about congressional intent. Thus, in both *City of New York* and *Louisiana Pub. Serv. Comm'n*, the Supreme Court justified the second prong of

the analysis on the ground that " 'the best way of determining whether Congress intended the regulations of an administrative agency to displace state law is to examine the nature and scope of the authority granted by Congress to the agency.' " *City of New York*, 486 U.S. at 66, 108 S.Ct. at 1643 (quoting *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374, 106 S.Ct. at 1901). Indeed, in *Louisiana Pub. Serv. Comm'n*, the Supreme Court seemed to *refocus* on congressional intent, reaffirming that "[t]he critical question in any pre-emption analysis is always whether Congress intended that federal regulation supersede state law," citing *Rice*, 331 U.S. 218, 67 S.Ct. 1146, without reference to the "narrow focus" language of *de la Cuesta. Louisiana Pub. Serv. Comm'n*, 476 U.S. at 369, 106 S.Ct. at 1899; *see also Freehold Cogeneration Assocs., L.P.*, 44 F.3d at 1190 . ("Of course, the application of the [agency] preemption doctrine requires a determination of congressional intent in enacting a federal law."), nor any reference to *Chevron* deference to any agency's interpretation of congressional intent. Under *City of New York* and *Louisiana Pub. Serv. Comm'n*, then, whatever the agency may think of its power to preempt state law, the ultimate question is not what the agency intends, but what Congress intends. This ultimate dispositive effect of congressional intent, rather than agency intent, again suggests that there should be no general deference to the agency's determination to preempt state law.

Because of this continued critical importance of congressional intent, and this court's reading of *City of New York* and other decisions of the Supreme Court as according the agency no deference whatsoever in the determination of Congress's intent to allow the agency to preempt state law, this court must respectfully, but specifically, disagree with the interpretation of *City of New York* offered by the Eleventh Circuit Court of Appeals in *Teper*, 82 F.3d at 998. That interpretation was that "even if a statute is on its face ambiguous, Congress's intent to preempt may be clear when the administrative agency expressly responsible for interpreting and implementing the statute has clarified it." *Teper*, 82 F.3d at 998. To the contrary, under *City of New York*, when the

question is whether an agency has the authority to preempt state law, the agency is powerless to clarify congressional intent. In no decision of the Supreme Court regarding agency preemption does this court find that the Supreme Court even looked to the agency's interpretation of congressional intent to preempt state law as relevant to the second prong of the inquiry. Instead, this court concludes from the Supreme Court's analyses, the reviewing court must determine the agency's authority, *i.e.*, must determine Congress's intent to allow the agency to preempt state law, without any deference to the agency, by examining for itself " 'the nature and scope of the authority granted by Congress to the agency.' " *City of New York*, 486 U.S. at 66, 108 S.Ct. at 1643 (quoting *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374, 106 S.Ct. at 1901). Thus, although an agency's interpretation of a statute the agency is charged with implementing may otherwise be treated with deference under *Chevron* when the intent of Congress is unclear, such deference does not extend to an agency's interpretation of its own power to preempt state law when Congress has not expressly stated its intent to delegate such power to the agency.

*iv. Agency accountability.* One justification for deference to an agency offered in *Chevron*, and consequently offered by some courts as a justification for deference to an agency's preemption determination, is that an agency is more "accountable" than are courts. In *Chevron*, the Court made the following observations:

> Judges are not experts in the field, and are not part of either political branch of Government. Courts must, in some cases, reconcile competing political interests, but not on the basis of the judge's personal policy preferences. In contrast, an agency to which Congress has delegated policy-making responsibilities may, within the limits of that delegation, properly rely upon the incumbent administration's views of wise policy to inform its judgments. While agencies are not directly accountable to the people, the Chief Executive is, and it is entirely appropriate for this political branch of the Government to make such policy choices—resolving the compet-

ing interests which Congress itself either inadvertently did not resolve, or intentionally left to be resolved by the agency charged with the administration of the statute in light of everyday realities.

When a challenge to an agency construction of a statutory provision, fairly conceptualized, really centers on the wisdom of the agency's policy, rather than whether it is a reasonable choice within a gap left open by Congress, the challenge must fail. In such a case, federal judges—who have no constituency—have a duty to respect legitimate policy choices made by those who do. The responsibilities for assessing the wisdom of such policy choices and resolving the struggle between competing views of the public interest are not judicial ones: "Our Constitution vests such responsibilities in the political branches." *TVA v. Hill*, 437 U.S. 153, 195 [98 S.Ct. 2279, 2302, 57 L.Ed.2d 117] (1978).

*Chevron*, 467 U.S. at 865–66, 104 S.Ct. at 2793. Similarly, when considering an agency preemption question, the Eleventh Circuit Court of Appeals observed that "separation of powers (or institutional competence) concerns might counsel in favor of courts' deferring to agencies in the resolution of ambiguous questions of statutory interpretation," citing *Chevron*. *Teper*, 82 F.3d at 998 & n. 11.

However, the Eleventh Circuit Court of Appeals also quite correctly recognized that "countervailing federalism concerns offset this rationale for *Chevron* deference in preemption cases. Although federal agencies are more democratically accountable than courts, state legislatures are arguably yet more politically accountable." *Id.* In this age of tort reform, the extent to which state legislatures have left intact common law actions or have codified them suggests that the "accountability" of the states should not be ignored in favor of the indirect and nebulous accountability of agencies. To put it another way, the persistence of state common law causes of action is an expression of the will of the governed, because the governed can, and often do, hold legislatures accountable when reform of common law is required.

▪ One commentator has suggested other reasons the "accountability" argument should not be persuasive when the question is whether to accord deference to an agency's determination of its jurisdiction or power to preempt state law. "[I]t would ... seem[ ] exceedingly odd to suggest that [an agency] should be allowed to resolve ambiguities in a statute governing its own jurisdiction. The danger of bias and self-dealing is so great as to make·[the agency] an interested party." Sunstein, *After Chevron*, 90 COLUM.L.REV. at 2099. This court agrees that there is a danger of bias and self-dealing in such a situation. As the Supreme Court has said, "To permit an agency to expand its power in the face of a congressional limitation on its jurisdiction would be to grant to the agency power to override Congress. This we are both unwilling and unable to do." *Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374–75, 106 S.Ct. at 1902. Congress, not the agency, determines the authority it delegates to the agency. This court must therefore seek congressional intent without deference to the agency in order to ensure that the agency does not "expand its power in the face of a congressional limitation on its jurisdiction." *Id.*

The same commentator cited above suggested a solution to the conflict between accountability and partiality: "Probably the best reconciliation of the competing considerations of expertise, accountability, and partiality is to say that no deference will be accorded to the agency when the issue is whether the agency's authority extends to a broad area of regulation, or to a large category of cases, except to the extent that the answer to that question calls for determinations of fact and policy." *Id.* at 2100. This solution parallels almost exactly this court's reading of the point at which any deference is afforded an agency on a preemption issue under *City of New York*. Under this court's reading of *City of New York*, deference to the agency only arises when the agency is addressing policy matters committed to it by Congress. This court therefore finds arguments based on agency "accountability" are not persuasive on the question of whether an agency should be accorded deference in a determination of the agency's power to preempt state law.

**■ v. The presumption against pre-emption.** Finally, the court concludes that a general deference to an agency's determination to preempt state law would run counter to the requirement that courts entertain a presumption against preemption. Although the "nature of the inquiry" in an agency preemption case may be different from that in a statutory preemption case, the Supreme Court has nonetheless made clear that the same presumption mitigating against preemption applies. In an agency preemption case, the Court found that a serious impediment to preemption was "the presumption that state and local regulation of matters related to health and safety is not invalidated under the Supremacy Clause." *Hillsborough County,* 471 U.S. at 715, 105 S.Ct. at 2376. The Court explained:

> "Where ... the field that Congress is said to have pre-empted has been traditionally occupied by the States 'we start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Jones v. Rath Packing Co.,* 430 U.S., at 525 [97 S.Ct. at 1309] (quoting *Rice v. Santa Fe Elevator Corp.,* 331 U.S., at 230) (citations omitted).... *Of course, the same principles apply where, as here, the field is said to have been pre-empted by an agency, acting pursuant to congressional delegation.* Appellee must thus present a showing of implicit pre-emption of the whole field, or of a conflict between a particular local provision and the federal scheme, that is strong enough to overcome the presumption that state and local regulation of health and safety matters can constitutionally coexist with federal regulation.

*Hillsborough County,* 471 U.S. at 715–16, 105 S.Ct. at 2376 (some internal citations omitted; emphasis added); *see also Wabash Valley Power Assoc., Inc. v. Rural Electrification Admin.,* 988 F.2d 1480, 1485–86 (7th Cir.1993) (concluding that, in the absence of "the clear and manifest purpose of Congress," "the same principle" of a presumption against federal preemption of a field traditionally occupied by the states, such as an area within the historic police powers of the states, applies to regulatory preemption as applies to federal statutory preemption, citing *Rice,* 331 U.S. at 231, 67 S.Ct. at 1152–53, and *Hillsborough County,* 471 U.S. at 715, 105 S.Ct. at 2376).

This court concludes further that the presumption applies even when the agency has expressly stated its intent to preempt state law, because the presumption persists unless dispelled by the "clear and manifest purpose of Congress," *Rice,* 331 U.S. at 231, 67 S.Ct. at 1152, not by the "clear and manifest purpose" of the agency. To put it another way, because an agency has no more power to preempt state law than is delegated to it by Congress, *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 374, 106 S.Ct. at 1901, and the "clear and manifest purpose of Congress" is required to dispel the presumption against federal preemption of traditional state police powers, *Rice,* 331 U.S. at 231, 67 S.Ct. at 1152, agency intent cannot be substituted for congressional intent. To accord deference to agency intent as sufficient to overcome the presumption would at least potentially permit an agency to expand its power beyond the limits Congress intended. This courts should be "both unwilling and unable to do." *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 375, 106 S.Ct. at 1902.

To summarize, in those Supreme Court decisions in which the Court appeared to defer to an agency determination that its regulations should preempt state law, the Court had first determined that the agency had acted to accommodate conflicting policies committed to the agency's care by statute. *See City of New York,* 486 U.S. at 69, 108 S.Ct. at 1645; *Crisp,* 467 U.S. at 707–09, 104 S.Ct. at 2704–06; *de la Cuesta,* 458 U.S. at 170, 102 S.Ct. at 3031. However, in the process of making a determination of whether the agency intended to preempt state law, and the further determination of whether Congress had authorized the agency to make such preemptive regulations as to the policies in question, the Court accorded the agency no deference whatsoever. Furthermore, where the Court found that the agency had *not* been granted the authority to accommodate conflicting policies, because those policies were not within the agency's purview, the Court rejected the agency's power to

issue preemptive regulations. *See Louisiana Pub. Serv. Comm'n,* 476 U.S. at 374, 106 S.Ct. at 1901–02. Similarly, where the agency explicitly stated that it had no intention of preempting state regulation, the court looked with disfavor on assertions that the regulations nonetheless preempted state law. *Hillsborough County,* 471 U.S. at 716, 105 S.Ct. at 2376–77. Indeed, in these circumstances, the deference the court was required to show was to the power of the state to regulate matters within its police power or *within* its power *to regulate health and safety* matters. *Id.*

### B. The Preemptive Effect of APHIS Regulations

Having established what this court deems to be the proper analysis of questions of agency preemption, and the proper circumstances under which agency determinations are due any deference in that analysis, the court turns to analysis of the preemptive effect of the agency regulations at issue here. Although no other court has applied an analysis of the preemptive effect of APHIS regulations in the manner this court has postulated is appropriate, nor has any court considered the preemptive effect of those regulations on tort claims of physical injury to *humans,* the court nevertheless begins with the existing, somewhat limited precedent concerning the preemptive effect of APHIS regulations before turning to its own analysis of the question.

### 1. Prior decisions

The leading decision on the preemptive effect of APHIS regulations on state tort causes of action is the decision of the Seventh Circuit Court of Appeals in *Lynnbrook Farms v. SmithKline Beecham Corp.,* 79 F.3d 620 (7th Cir.1996), *cert. denied,* —— U.S. ——, 117 S.Ct. 178, 136 L.Ed.2d 118 (1996). At the outset of its analysis, the Seventh Circuit Court of Appeals noted that the question of the validity and scope of APHIS's preemption of state law causes of action was one of first impression at the circuit court level. *Lynnbrook Farms,* 79 F.3d at 623. This court finds the question has not yet been presented to any other circuit court of appeals. Thus, if for no other reason, the *Lynnbrook Farms* decision would be central to this court's analysis.

#### a. Lynnbrook Farms

In *Lynnbrook Farms,* the plaintiff cattle producer sued the same manufacturer of livestock vaccines that is a defendant here, SBC, alleging that the cattle producer's cattle were injured and many were killed after being inoculated with animal vaccines manufactured by SBC. *Lynnbrook Farms,* 79 F.3d at 622. Thus, at the outset, this court must point out that the *Lynnbrook Farms* decision involves state tort claims that are entirely different from those presented by the Garrelts in this litigation. In *Lynnbrook Farms,* the district court had granted SBC's motion for summary judgment on the ground that the plaintiff's claims were preempted by APHIS regulations promulgated pursuant to VSTA. *Id.* at 622–23. The Seventh Circuit Court of Appeals found that APHIS has declared that "states are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency or purity of a product." *Id.* at 623 (quoting 57 Fed.Reg. 38759 (August 27, 1992)). Although Lynnbrook Farms contested both the validity and the scope of the preemption provision, SBC maintained that this express declaration of preemption by the agency encompassed all of Lynnbrook's claims, and the district court agreed with SBC. *Id.*

The Seventh Circuit Court of Appeals observed,

> According to our research, all other courts that have addressed the issue, including the district court below, have reached a conclusion similar to that which we reach today, *i.e.,* that state common law claims of the type asserted in this case are preempted by the APHIS regulation. *See Lynnbrook Farms v. SmithKline Beecham Corp.,* 887 F.Supp. 1100 (C.D.Ill.1995); *Murphy v. SmithKline Beecham Corp.,* 898 F.Supp. 811 (D.Kan.1995); *Brandt v. The Marshall Animal Clinic and SmithKline Beecham Corp.,* 540 N.W.2d 870 (Minn.Ct.App.1995).

*Lynnbrook Farms,* 79 F.3d at 623. Having thus foreshadowed its conclusions, the Sev-

enth Circuit Court of Appeals turned to its analysis of the preemption question.

The Seventh Circuit Court of Appeals found that SBC's sole argument, there as here, was that APHIS expressly preempted all state law claims pursuant to the power delegated to it under VSTA, and thus in that case SBC was not relying in any way on a theory of implied preemption. *Id.* at 624 & n. 1.[20] The court then stated the two-prong analysis of agency preemption established by *City of New York* and other Supreme Court precedent. *Id.* ("[T]he proper inquiry is to determine whether the power to preempt is within the bounds of authority granted to the agency by Congress, and if so, whether the agency has acted on this authority," citing *City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642). However, the view of the Seventh Circuit Court of Appeals on the deference to be shown an agency in this analysis is distinctly different from this court's:

> The Court has made clear that the great deference generally afforded agency action is not discarded when the agency uses its delegated discretion to preempt. "Where Congress has directed an administrator to exercise his discretion," and the administrator promulgates regulations intended to preempt state law, "his judgments are subject to judicial review only to determine whether he has exceeded his statutory authority or acted arbitrarily." *de la Cuesta,* 458 U.S. at 154–55, 102 S.Ct. at 3023; *see also Crisp,* 467 U.S. at 699–700, 104 S.Ct. at 2700–01.

*Lynnbrook Farms,* 79 F.3d at 624. Therefore, the Seventh Circuit Court of Appeals either assumed that deference was the general rule, or initially implicitly concluded or assumed that the preemption determination in the case before it fell within the zone of deference to which it alluded, because nowhere does that court in the *Lynnbrook Farms·* decision appear to recognize the caveats on deference this court finds to be critical.[21]

---

**20.** The extent to which SBC relies on an implied preemption theory to encompass the Garrelts' claims in this case will be addressed below.

**21.** As noted below, the Seventh Circuit Court of Appeals did later expressly find, however, that

The Seventh Circuit Court of Appeals undertook a three-part analysis of the question of whether APHIS's regulatory actions preempted Lynnbrook Farms' state law claims that, although somewhat different in its formulation, embodies the key parts of the *City of New York* inquiry:

> First, we must ascertain whether the power to preempt is within the authority delegated to the USDA and APHIS by Congress and is a rational exercise of that authority. If so, we then ask whether APHIS intended *its regulations to preempt* state common law claims. Finally, if APHIS did seek to preempt state common law, we consider whether the regulations preempt the specific causes of actions [sic] asserted by Lynnbrook.

*Lynnbrook Farms,* 79 F.3d at 624. Only the last prong of this analysis appears to be new, but in reality it is simply an express statement of the ultimate question implicit in any analysis of preemption in a specific case, *i.e.,* are *these* claims preempted by the agency's regulations?

As to the first prong of this analysis, the Seventh Circuit Court of Appeals looked first to "the congressional mandate that forms the basis of the agency's authority." *Id.* The court found as follows:

> VSTA requires that all animal vaccines produced in the United States and all establishments that manufacture such vaccines be licensed by the USDA. 21 U.S.C. § 154. The Act also broadly confers on the USDA the authority to "make and promulgate from time to time such rules and regulations as may be necessary to prevent the preparation [and] sale ... of any worthless, contaminated, dangerous, or harmful . virus, serum, toxin, or analogous product for use in the treatment of domestic animals...." *Id.* The USDA has delegated this responsibility and authority to APHIS. 9 C.F.R. § 101.2. APHIS, in turn, has promulgated an ex-

"[t]he instant case of preemption reflects a prime example of ... an accommodation" of policies committed to the agency's care. *Lynnbrook Farms,* 79 F.3d at 625–26.

tensive regulatory scheme governing the design, manufacture, distribution, testing, and labelling of animal vaccines. *See* 9 C.F.R. §§ 101–24.

*Id.* The court next found that in response to judicial decisions holding that the scope of VSTA, and APHIS regulations promulgated thereunder, was limited to products made and sold in interstate commerce, and hence APHIS had no authority to regulate animal vaccines manufactured and sold within an individual state, Congress amended VSTA in 1985 to place both interstate and intrastate vaccines clearly within the ambit of federal control. *Id.* at 625 (citing 21 U.S.C. § .151; S.Rep. No. 145, 99th Cong., 1st Sess. 338–39 (1985), reprinted in 1985 U.S.CODE CONG. & ADMIN.NEWS 1676, 2004–05). Furthermore, the court found that "[t]he amendments reflect the Congressional finding that. federal regulation was 'necessary to prevent and eliminate burdens on commerce and to effectively regulate such commerce.'" *Id.* (quoting 21 U.S.C. § 159). The court next briefly reviewed the somewhat sparse legislative history to the 1985 amendments, and concluded it "also evinces an unquestionable congressional intent to create national, uniform standards for the preparation and sale of animal vaccines," because "Congress ... concluded that uniform, federal standards would better serve livestock owners, veterinarians, and the American public." *Id.* (citing S.Rep. No. 145 at 339).

The Seventh Circuit Court of Appeals next examined APHIS's express declaration of preemption, which states, in pertinent part, the following:

> *Where safety, efficacy, purity, and potency of biological products are concerned, it is the agency's intent to occupy the field.* This includes, but is not limited to the regulation of labeling. Under VSTA, Congress clearly intended that there be national uniformity in the regulation of these products.
>
> \* \* \* \* \* \*
>
> Seven commenters indicated that States should have the authority to add to Federal restrictions, as appropriate, based on a need to protect *animal or human health and safety* so long as such restrictions do

not lessen the effect of Federal regulations.... *APHIS ... does not agree that States should be allowed to add various restrictions ... based upon a need to protect domestic animals or the public health, interests or safety.* Any restrictions, other than those which are necessary to address a local disease condition, should be Federally imposed so that they are uniform nationwide.

\* \* \* \* . \* \* ·

> *States are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product. Similarly, labeling requirements which are different from or in addition to those in the regulations under the Act may not be imposed by the .States.* Such additional or different requirements would thwart the Congressional intent regarding uniform national standards, and would usurp USDA's authority to determine which biologics are pure, safe, potent and efficacious.

57 Fed.Reg. 38758, 38759 (August 27, 1992) (emphasis added); *see · also Lynnbrook ·Farms,* 79 F.3d at 625 (quoting similar portions of the declaration). In light of this declaration of preemption and the authority the court found APHIS had been granted, the Seventh Circuit Court of Appeals concluded as follows:

> We find that APHIS acted rationally and within the scope of the authority granted to it by Congress in issuing the above statement seeking to preempt state law. Congress granted the USDA and APHIS the broad regulatory power to promulgate and enforce "such rules and regulations as may be necessary" to prevent the production and sale of any "worthless, contaminated, dangerous or harmful" animal vaccines. Congress also delegated to the USDA and APHIS the responsibility to eliminate "undue burdens" on commerce in this area, and toward that end, to establish a national, uniform regulatory scheme. It is apparent that APHIS' congressional mandate is to ensure safe and effective vaccines while at the same time minimize

undue burdens on interstate commerce that often accompany varied state regulation. Given these powers and responsibilities, APHIS was acting rationally, and well within its congressionally delegated discretion, in creating a complex statutory scheme governing the safety, efficacy, purity, and potency of animal vaccines and in pronouncing this scheme to be the exclusive law in the area.

*Lynnbrook Farms*, 79 F.3d at 625. Noting that the Supreme Court had stated that courts should not disturb any agency's reasonable accommodation of conflicting policies committed to its care, the Seventh Circuit Court of Appeals found that "[t]he instant case of preemption reflects a prime example of such an accommodation." *Id.* at 626. Furthermore,

> [n]othing in the legislative history of either VSTA or its amendments indicates that APHIS' actions would not be congressionally sanctioned. On the contrary, the course chosen serves only to further VSTA's purposes—further indicating that the agency was acting within its authority and not acting arbitrarily. *See de la Cuesta*, 458 U.S. at 159, 102 S.Ct. at 3025. Thus we decline to disturb the agency's judgment to preempt state law.

*Id.* The court found its conclusion bolstered by Supreme Court precedent on agency preemption, and furthermore rejected Lynnbrook Farms' assertion that any distinction could or should be made between preemption of state regulations or statutes and preemption of state common-law causes of action. *Id.* at 626–27. The court also found that the presumption against preemption, and the heightened presumption in areas that have traditionally been the province of states, such as health and safety, "can be overcome by an agency's clear declaration of intent to preempt state law." *Id.* at 627 (citing *Hillsborough County*, 471 U.S. at 715–16, 105 S.Ct. at 2376–77). However, this court has concluded above that the presumption against preemption cannot be overcome simply by the "clear declaration of intent" *by the agency*, and cannot read any such proposition into the decision of the Supreme Court in *Hillsborough County*. As

this court has said above, the "same principle" to which the Supreme Court referred in *Hillsborough County* was not whether the agency may defeat the presumption against preemption with a "clear declaration of intent," but the principle that the presumption against preemption is also applicable to asserted agency preemption. *See Hillsborough County*, 471 U.S. at 715–16, 105 S.Ct. at 2376–77. Furthermore, *Hillsborough County* found no express declaration of preemption by the agency in the case before it, but instead an express *rejection* of preemption, and further rejected the notion that the comprehensiveness of agency regulations could imply the necessary basis for defeating the presumption. *Id.* at 716–18, 105 S.Ct. at 2376–78. For these and other reasons this court has already stated, mere agency declarations cannot defeat the presumption, which obtains until the "clear and manifest purpose of Congress" to preempt state law is found. *Rice*, 331 U.S. at 231, 67 S.Ct. at 1152–53.

Considering further whether APHIS intended to preempt state common-law causes of action, the Seventh Circuit Court of Appeals found,

> As set forth above, APHIS' preemption statement is clear and comprehensive. In an effort to fulfill its mandate to create a national, uniform system of regulations, APHIS announced it intended to "occupy the field" concerning "the safety, efficacy, purity and potency of biological products." Toward this goal, APHIS decisively stated that "[s]tates are not free to impose requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product."

*Lynnbrook Farms*, 79 F.3d at 627. The court also found that the Supreme Court had concluded that language similar to that in the APHIS regulations, but embodied in statutes, encompassed common law actions. *Id.* at 627–29. Next, the court reviewed the Medley Letter found in this court's findings of fact. *Id.* at 629. The court concluded as follows:

> We must agree with SBC that the correspondence confirms the interpretation that APHIS intended certain state tort claims

to be preempted. Contrary to Lynnbrook's argument that APHIS only intended to preempt positive enactments, the agency included in its preemptive scope additional requirements dictated by States via "regulations, statutes, or other means." The phrase "or other means" clearly encompasses state tort claims. Moreover, APHIS' letter signals that state tort claims are available when APHIS regulatory standards are violated or disregarded. *The natural conclusion to draw from this statement is that when APHIS regulations are heeded, state tort claims involving the safety, efficacy, potency, or purity of an animal vaccine do not survive.* This dichotomy follows from the preemption language chosen by APHIS, as it is precisely when APHIS regulations have been satisfied that a common law action imposes requirements in addition to, or different from, those mandated by APHIS. Where noncompliance is involved, a common law action could simply serve to impose the standards of APHIS. Thus, it is evident that APHIS intended to preempt common law claims relating to areas under its regulatory control (namely the safety, purity, potency, and efficacy of vaccines) which would impose additional or different requirements on vaccines, *i.e.,* common law claims involving regulated areas in cases where the manufacturer has complied with all APHIS regulations and standards.

*Id.* at 629–30 (emphasis added). The court therefore turned to the final prong of its inquiry.

As to the question addressed in that final prong, whether Lynnbrook Farms' claims fell within the preempted group of claims, the court concluded first that SBC's vaccines, including Ultrabac 7/Somubac, "met APHIS standards for safety, purity, potency, and efficacy." *Id.* at 630. Thus, whether Lynnbrook Farms' claims were preempted turned on the question of whether its "claims relate to these qualities, seeking to impose additional or different requirements in these areas." *Id.* The court then found strict products liability claims had been preempted as at least regarding safety, if not efficacy, purity, and potency, of the cattle vaccines to cattle. *Id.* The court next rejected as preempted

claims of breach of implied warranties of fitness for a particular purpose and of merchantability as implicating efficacy and safety of the vaccines for cattle. *Id.* As with the strict liability claims, these claims were preempted, because they would impose additional or different duties beyond those imposed by APHIS regulations. *Id.* The court also found Lynnbrook Farms' claims of fraudulent misrepresentation and false advertising, based on allegations that SBC falsely represented the vaccines to be safe and effective for cattle when SBC knew they were not, had been preempted, because a jury would have to find, contrary to APHIS's conclusions, that the vaccines were not safe and effective, and that they would require labeling requirements distinct from those dictated by APHIS. *Id.* This latter conclusion, the court determined, also meant that strict liability failure to warn claims were preempted. *Id.* Thus, the Seventh Circuit Court of Appeals held that all of Lynnbrook Farms' claims, based on the injury to or death of its cattle following use of SBC's vaccines, were preempted by APHIS regulations. *Id.*

### b. Other decisions

Most of the decisions of other courts rendered prior to *Lynnbrook Farms* are very similar to that of the Seventh Circuit Court of Appeals, both in terms of the nature of the claims and the analysis of the preemption issue. *See Murphy v. SmithKline Beecham Corp.,* 898 F.Supp. 811 (D.Kan.1995) (claims arising from injection of cattle with vaccines manufactured by SBC, BoviShield 4 and BoviShield 4+L5, asserting that vaccines induced or failed to prevent debilitating and mortal infections and diseases in the plaintiff's cattle based on breach of implied warranty, false advertising, fraudulent misrepresentation, negligence, and failure to warn, were all preempted under APHIS regulations); *Lynnbrook Farms v. SmithKline Beecham Corp.,* 887 F.Supp. 1100 (C.D.Ill. 1995) (decision below in *Lynnbrook Farms* decision of the Seventh Circuit Court of Appeals); *Brandt v. The Marshall Animal Clinic and SmithKline Beecham Corp.,* 540 N.W.2d 870 (Minn.Ct.App.1995) (reversing

state district court's denial of summary judgment on certified question for appellate review, the appellate court concluded the state tort claims based on illness and death of cattle after injection with SBC vaccines, including strict liability, defective design, negligence, misrepresentation, fraud in false advertising, fraudulent concealment of known defects, and breach of implied warranties of merchantability and fitness, were preempted under APHIS regulations). Thus, the court will not examine here the details of these decisions. Of far greater interest here, however, are a few recent decisions that, contrary to the prevailing trend, leave open a door out of APHIS's realm of preemption.

The first of these decisions is an unpublished ruling of the United States District Court for the Northern District of Georgia in *Gresham v. Boehringer Ingelheim Animal Health, Inc.,* Civil No. 1:95–cv–3376–ODE (N.D.Ga. Aug. 7, 1996). In *Gresham,* the plaintiff claimed that his cattle suffered permanent damage after receiving doses of a defective vaccine, called Alpha–7, manufactured by the defendant. *Gresham,* slip op. at 1. The plaintiff asserted claims under Georgia law based on strict liability, negligence, breach of express warranty, and breach of implied warranties of merchantability and fitness for a particular purpose. *Id.* The defendant moved for summary judgment asserting the plaintiff's state-law claims were preempted by APHIS regulations. *Id.* at 3. The district court acknowledged rulings, such as *Lynnbrook Farms,* 79 F.3d at 625, as uniformly holding that APHIS acted within its authority in issuing its declaration of preemption and that the APHIS regulations preempt all state common law actions relating to the safety, purity, potency, or efficacy of animal vaccines which would impose additional or different requirements from those imposed by the USDA, based on similarities between the language of VSTA and the language of the Medical Devices Act (MDA), 21 U.S.C. § 360k(a). *Id.* at 4. However, the district court cited *Medtronic, Inc.,* as "indicat[ing] that these cases may no longer support a broad presumption of preemption under VSTA." *Gresham,* slip op. at 5 (citing *Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2251). The court wrote,

In *Medtronic,* the Supreme Court rejected the defendant's assertion that the plain language of § 360k(a) necessitated the preemption of all common law causes of action. A plurality of the Court reasoned that this interpretation of "requirement" was implausible given that it would "have the perverse effect of granting complete immunity from design defect liability to an entire industry." *Id.* at *9. A plurality of the Court found that based on the legislative history of the statute and ambiguous language, Congress did not intend to preclude "most, let alone all, general common-law duties enforced by damages actions." *Id.* at *11. The Court remanded the plaintiff's claims for negligent design and manufacture, failure to warn, and strict liability for further proceedings. *Id.* at *16.

While there are significant differences between the MDA and VSTA, *Medtronic* counsels against construing VSTA's preemption provision so broadly as to leave Plaintiff no remedy in the instant case. While Congress in enacting VSTA was clearly concerned with eliminating burdens on interstate commerce, the "purpose of the Act is to assure that biologics used in the treatment of animals are pure, safe, potent, and efficacious." 57 FR 38758. If VSTA is interpreted to completely insulate manufacturers from liability, it cannot achieve its purpose because manufacturers would have no incentive to maintain quality control after USDA approval.

With this in mind, the court turns to evaluate whether Plaintiff's specific causes of action would impose upon Defendant "requirements which are different from, or in addition to, those imposed by USDA regarding the safety, efficacy, potency, or purity of a product." 57 FR 38759. In *Medtronic,* the Court held that similar language in § 360k(a) did not preempt claims based on a manufacturer's failure to comply with FDA regulations. The Court reasoned that such claims were parallel to federal requirements rather than different from or in addition to such requirements. *Id.* at *12. Moreover, a letter issued on December 22, 1995 by the Acting Administrator of APHIS supports the extension of

this finding to VSTA. That letter, as quoted in *Lynnbrook Farms*, states that APHIS "did not intend to preempt common law actions for damages arising from non-compliance with USDA regulatory standards." *Lynnbrook Farms*, 79 F.3d 620, 629 (7th Cir.1996).

Plaintiff makes clear in his brief in opposition to Defendant's motion for summary judgment that his negligence claim is premised on the notion that Defendant provided a "bad batch" of Alpha–7 to Plaintiff. Although he does not explain the context of his strict liability claim, claims for breach of implied warranties of merchantability and fitness, and claim for breach of express warranty, a review of the facts cited by Plaintiff indicates that these counts are also premised on the "bad batch" theory. To the extent that Plaintiff intends to prove that the particular batch of Alpha–7 which he received was not in compliance with federal regulations, these actions do not impose requirements different from or in addition to those established by APHIS.

The court finds, therefore, that Defendant's preemption arguments are without merit. Plaintiff's claims in the instant case may go forward to the extent that they are premised on a "bad batch" theory. It is important to note, however, that in prosecuting these claims Plaintiff may not challenge the adequacy of the federal regulations or the formula of Alpha–7 approved by the USDA. Such claims are preempted under VSTA.

*Gresham*, slip op. at 6–8 (footnotes omitted). The second ruling to call into question the preemptive reach of APHIS regulations, also unpublished, is *Stegmaier v. SmithKline Beecham Animal Health, Inc.*, No. 4–95–CV–149 (D.Minn. Aug. 22, 1996). In *Stegmaier*, the plaintiff asserted claims based on "accidental self-injection of swine vaccine." *Stegmaier*, slip op. at 1. In light of the Supreme Court's decision in *Medtronic*, the United States District Court for the District of Minnesota concluded that the defendant animal vaccine maker's motion for summary judgment grounded on preemption should be denied "without prejudice." The court ordered the filing of supplemental briefs "on the effect, if any, of the Supreme Court's [*Medtronic*] decision on the case at bar." *Id.*

Although the court cannot construe the Garrelts' claims to assert "bad batch" theories, the Garrelts have contended that they are not seeking to enforce requirements that are different from or in addition to APHIS requirements, but are instead seeking to enforce USDA standards. They have also asserted that the Supreme Court's decision in *Medtronic* changes the preemption analysis, or, more properly, changes the presumptions in the preemption analysis, sufficiently that their claims are not preempted. The court will consider below whether these arguments are persuasive.

### 2. *This court's preemption analysis*

Finding that the prior decisions considering whether APHIS regulations preempt state tort claims are either unpersuasive or inapplicable, the court must embark on its own analysis of the preemptive effect of APHIS regulations on the specific tort claims raised here. Thus, under *City of New York*, the court must first determine whether APHIS intended to preempt the state tort claims at issue here. *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642. Next, if the court finds such intent to preempt on the part of the agency, the court must determine whether APHIS acted within its authority delegated from Congress. *Id.* Only if the court finds that Congress has delegated to APHIS specific policy determinations at issue here and the authority to resolve conflicts among those policies will this court accord any deference to the agency's determination to preempt the specific tort claims presented. *Id.* Finally, of course, the court must determine whether the specific tort claims presented in this lawsuit are indeed preempted, based on APHIS's intent and the scope of its delegated authority. *Lynnbrook Farms*, 79 F.3d at 624.

#### a. *APHIS's intent to preempt*

SBC contends that APHIS's intent to preempt state law, including state tort claims for personal injury, is manifest and unambig-

uous. SBC relies on APHIS's statement of preemptive intent in 57 Fed.Reg. 38758, 38759 (August 27, 1992), and its confirmation in the Medley Letter in December of 1995. SBC contends that the Garrelts' claims would impose requirements that are different from or in addition to those APHIS imposes, and hence are of the kind APHIS expressly intended to preempt. As to whether APHIS expressly intended to preempt claims for injuries to *humans,* SBC points out that APHIS rejected public comments that states should be permitted to add various restrictions based upon a need to protect human health and safety, citing the following from the 1992 declaration of preemption:

> Seven commenters indicated that States should have the authority to add to Federal restrictions, as appropriate, based on a need to protect *animal or human health and safety* so long as such restrictions do not lessen the effect of Federal regulations.... *APHIS ... does not agree that States should be allowed to add various restrictions, as appropriate, based upon a need to protect domestic animals or the public health, interests, or safety.* Any restrictions, other than those which are necessary to address a local disease condition, should be Federally imposed so that they are uniform nationwide.

> \* \* \* \* \* \*

> *Such additional or different requirements would thwart the Congressional intent regarding uniform national standards, and would usurp USDA's authority to determine which biologics are pure, safe, potent and efficacious.*

57 Fed.Reg. at 38579 (as excerpted and with emphasis as added by SBC). SBC argues that APHIS pays significant attention to human health and safety in the pre-market licensing approval process, because vaccines containing certain antigens, such as live Newcastle Disease virus and live rabies virus, are subject to special labeling requirements noting the extent to which exposure to the antigens can cause disease in humans, 9 C.F.R. § 112.7(a), while other additional restrictions may be imposed where APHIS determines that the protection of domestic animals or the public health, interest, or safety

necessitate such restrictions. 9 C.F.R. § 102.5(e). Thus, SBC contends that APHIS intended to bar states from imposing "different" or "additional" restrictions regardless of whether a state's restriction pertains to animal or human health.

The Garrelts counter that APHIS's intent was clearly that state common law claims not be preempted. The Garrelts point out that APHIS requires no mandatory labels, but instead requires "[f]ull instructions for the proper use of the product, including vaccination schedules, warnings, cautions, and the like." 9 C.F.R. § 112.2(a)(5). The Garrelts further argue that it is unreasonable to conclude that APHIS intended to preempt state common law claims when APHIS regulations permit manufacturers to include on labels "any other information which is not false or misleading," but not disclaimers. 9 C.F.R. 112.2(b). The Garrelts also contend that APHIS's lack of intent to preempt state common law claims is apparent from the Medley Letter, in which the Acting Director stated that APHIS regulations are not intended "to preempt common law actions for damages arising from non-compliance with USDA regulatory standards." The proper interpretation of this statement, the Garrelts argue, is that claims arising from conduct violative of the USDA regulations are preserved. They further assert that such an interpretation would preserve the claims in this case, because warnings and cautions "appropriate" for the Ultrabac 7 vaccine were not included on the product label. 9 C.F.R. § 112.2(a)(5) (requiring "[f]ull instructions for the proper use of the product, including ... warnings, cautions...."). As their penultimate argument concerning APHIS's intent, the Garrelts assert that APHIS requires no testing for, or warning of, potential human harm from self-inoculation, suggesting APHIS's lack of intent to regulate such warnings. Lastly, citing *Medtronic,* the Garrelts contend that APHIS's intent should not be interpreted in such a way as to deprive the plaintiffs of any recourse.

The court concludes that APHIS has expressly stated its intent to preempt state common law claims based on injury to humans. In the absence of matters discussed

below, the Garrelts' reading of the agency's intent might be persuasive. Agency rules do indeed require the manufacturer of an animal vaccine to include "[f]ull instructions for the proper use of the product, including vaccination schedules, warnings, cautions, and the like," 9 C.F.R. § 112.2(a)(5), and do further permit the manufacturer to include on labels "any other information which is not false or misleading," and is not a disclaimer. 9 C.F.R. 112.2(b). Warnings such as those the Garrelts assert should have been given in this case would seem to be permitted, perhaps even required, by these provisions of the rules. However, that does not mean that APHIS did not intend to preempt the Garrelts' state tort claims.

There are two barriers to a conclusion that APHIS did not intend to preempt claims for human injury as the result of inadequate labeling, both based on APHIS's express statement of intent to preempt state law. *See City of New York*, 486 U.S. at 65–66, 108 S.Ct. at 1642–43 (where the agency has expressly stated its intent to preempt state law, the case does not turn on implications of conflict between the state and federal agency standards). The first such impediment is APHIS's identification of the kinds of *requirements* it intended to preempt. APHIS has expressly stated its intent to preempt claims imposing requirements "different" from or "additional" to those imposed by the agency. 57 Fed.Reg. at 38579. APHIS regulations specifically provide that labels must be reviewed and approved by APHIS prior to their use upon animal vaccines. 9 C.F.R. § 112.5. APHIS specifically reviews proposed labels for compliance with its regulations. *Id.* Thus, in order for the Garrelts to prevail on their claim of inadequate warning, a jury would have to find, contrary to APHIS's conclusion upon approval of SBC's label, that SBC's label did not comply with APHIS regulations. *Cf. Lynnbrook Farms*, 79 F.3d at 630 (failure to warn claim was preempted, because APHIS had already declared the product adequately labeled under its standards, and therefore the tort claim

would result in labeling requirements distinct from those dictated by APHIS). Such a conclusion would impose "additional" or "different" requirements from those imposed by APHIS. 57 Fed.Reg. at 38579.

The second impediment is APHIS's own declaration as to the kinds of *claims* that it intended to preempt. In its declaration in the Federal Regulations, APHIS rejected the argument that state regulations "based on a need to protect animal or *human* health and safety" that "do not lessen the effect of Federal regulations" should be permitted. 57 Fed.Reg. at 38759. State tort claims such as the Garrelts' are intended, at least arguably, not to lessen the effect of federal regulations, but actually to enforce those regulations. Nonetheless, APHIS concluded that states should not be allowed to add such restrictions, because "[a]ny restrictions, other than those which are necessary to address a local disease condition, should be Federally imposed so that they are uniform nationwide." *Id.* APHIS's intent to occupy the field as regards restrictions to protect human health and safety is thereby express.[22]

What, then, of APHIS's disclaimer of intent to preempt certain kinds of claims? *Hillsborough County*, 471 U.S. at 714–15, 105 S.Ct. at 2376 (the agency's statement that it *did not* intend to preempt state law "is dispositive on the question of implicit intent to pre-empt unless … the agency's position is inconsistent with clearly expressed congressional intent," citing *Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–83). One portion of the Medley Letter states that APHIS "did not intend to preempt state common law actions for damages arising from noncompliance with USDA regulatory standards." Medley Letter. This statement of lack of intent to preempt plainly leaves the door open for "bad batch" claims, *see Gresham*, slip op. at 8, because a jury would not be required to make any finding contrary to APHIS's, *see Lynnbrook Farms*, 79 F.3d at 630 (a claim requiring a jury to make a finding contrary to APHIS's was preempted);

---

**22.** These conclusions do not, however, mean that the court embraces APHIS's justification for such preemption. The court will return to the question of APHIS's justifications for preemption when it turns to the second prong of the *City of New York* inquiry, which asks whether APHIS's preemption was authorized by Congress.

rather, the jury would only have to find that the USDA standards under which a license had been granted had not been met as to a particular batch of vaccine. However, the analogous labeling claim would be a claim that the label APHIS had approved as adequate had not in fact been used in a particular case. The Garrelts do not make such a claim. Instead, the Garrelts claim that the label is inadequate under state tort law standards, despite having been approved by the agency under its standards.[23] Such a claim does involve "different" or "additional" standards, and therefore APHIS intended to preempt such a claim, 57 Fed.Reg. at 3879, or, to put it another way, the Garrelts' claim is not a claim that falls within the exception to intended preemption stated in the Medley Letter. Medley Letter (no intent to preempt claims for noncompliance with USDA standards).[24]

### b. Congressional authorization

Having concluded that APHIS did indeed intend to preempt state law, and, more specifically, the state law claims asserted by the Garrelts for human injury, the next question is whether Congress intended or authorized APHIS to preempt the state law upon which the Garrelts' claim is based. *City of New York*, 486 U.S. at 64, 108 S.Ct. at 1642. SBC asserts that congressional authorization is as apparent as APHIS's intent to preempt. SBC points out that in the VSTA, Congress authorized the agency to "promulgate ... such rules and regulations as may be necessary" to prevent the manufacture and sale "of any worthless, contaminated, dangerous, or harmful" animal vaccines, 21 U.S.C. § 154, and in another section, pursuant to amendments in 1985, authorized the agency to promulgate federal regulations "necessary to prevent and eliminate burdens on [interstate and intrastate] commerce [in animal vaccines] and to effectively regulate such commerce." 21 U.S.C. § 159. Thus, SBC argues, Congress plainly authorized uniform national standards for the preparation and sale of animal vaccines. SBC likens this congressional authorization to that found to be sufficient in various Supreme Court decisions. The manner in which APHIS was to effect these ends, SBC contends, was left to APHIS, which has responded with a complex and comprehensive regulatory network. SBC contends that "[t]here can be no doubt ... but that APHIS'[s] chosen course of preemption 'represents a reasonable accom-

**23.** APHIS's intent to preempt a state tort claim founded on the assertion that APHIS regulations state the applicable duty to warn cannot be doubted, because, where APHIS has determined that its regulatory standards have been met, the claim would plainly impose different and additional requirements contrary to APHIS's findings. *Lynnbrook Farms*, 79 F.3d at 630. A claim that APHIS improperly determined that the label meets its requirements cannot be asserted against SBC, but would instead be in the nature of a judicial review of APHIS's actions. That claim cannot be asserted here.

**24.** The Garrelts also argue that the record suggests that APHIS did not intend to preempt their claim for human injury, because APHIS requires no testing for, or warning of, potential harm to humans from self-inoculation. While "implied" preemption may be a recognized doctrine, implied lack of intent to preempt cannot survive in the face of expressed intent to preempt. *Cf. City of New York*, 486 U.S. at 65–66, 108 S.Ct. at 1642–43 (where the agency has expressly stated its intent to preempt state law, the case does not turn on implications of preemption because of regulatory conflicts); *Hillsborough County*, 471 U.S. at 714–15, 105 S.Ct. at 2376 (the agency's statement that it *did not* intend to preempt state law "is dispositive on the question of implicit intent to pre-empt unless ... the agency's position is inconsistent with clearly expressed congressional intent," citing *Chevron*, 467 U.S. at 842–45, 104 S.Ct. at 2781–83). The Garrelts' argument may have some force on the question of whether APHIS is competent to make determinations on the adequacy of labels, which are determinations it has stated it intends should occupy the field. Again, such an argument might properly arise in a judicial review of whether APHIS abused its discretion in approving a label that did not include warnings about possible human health harms, and may have some force later when the court considers whether APHIS's preemption decision is one Congress would have sanctioned. Unfortunately, it has little force when the question in this litigation is APHIS's intent to preempt state law, not its competence to do so, at least when that intent has been expressly stated.

The court finds that the Garrelts' final contention concerning APHIS's intent to preempt, based on the assertion that *Medtronic* counsels that APHIS's intent should not be interpreted in such a way as to deprive the plaintiffs of any recourse, should more properly be considered in the discussion of Congress's intent concerning, and authorization of, preemption of state law.

modation of conflicting policies that were committed to [APHIS'[s]] care by [VSTA].' " Brief In Support Of Defendant's Motion For Summary Judgment, p. 11 (quoting *Shimer*, 367 U.S. at 383, 81 S.Ct. at 1560). SBC reads the congressional authorization in 21 U.S.C. § 154, which authorizes regulations to prevent the manufacture or sale of any "dangerous or harmful" animal vaccines, as being broad enough to encompass preemption of claims for injury to humans, and finds nothing in VSTA suggesting that Congress intended to preclude preemption · of such claims. Finally, SBC asserts that APHIS has interpreted its role, in the absence of clear statements by Congress on the matter, as encompassing both human and animal safety. SBC contends that the agency's interpretation is entitled to deference under *Chevron.*

The Garrelts' arguments for a lack of congressional authorization are not altogether clear. In their brief, the Garrelts assert baldly that "APHIS clearly had no authority to 'occupy the field' of potential human injury claims arising out of the use of animal vaccines." Plaintiffs' Resistance To The Defendant's Motion For Summary Judgment And Memorandum, pp. 13–14. However, they cite no indicia of the lack of such authority. They then reassert that the "regulatory gap" caused by APHIS's failure to require information concerning potential human harm or warnings of such potential human harm shows that APHIS's intent to preempt state claims for human injury went beyond both regulatory practice and regulatory authority. However, it is apparent from other portions of their brief and their oral arguments that the Garrelts contend that *Medtronic* counsels against finding congressional authorization, and that, without some clearer statement of congressional authorization, the presumption against preemption of state authority to police health and safety matters should weigh against finding congressional authorization here.

 As this court has observed a number of times in this ruling, congressional intent remains critical to this second prong of the *City of New York* inquiry. *City of New York*, 486 U.S. at 66, 108 S.Ct. at 1643 (citing

*Louisiana Pub. Serv. Comm'n*, 476 U.S. at 374, 106 S.Ct. at 1901). Congressional intent, whether in the context of agency preemption or statutory preemption, is sought in the language, structure, and legislative history of the preempting or authorizing statute. *See id.* at 67–68, 108 S.Ct. at 1643–44 (agency preemption case looking at language and legislative history of the authorizing congressional act); *Crisp*, 467 U.S. at 708, 104 S.Ct. at 2705 (agency preemption case looking to the statutory language to find congressional authorization); *de la Cuesta*, 458 U.S. at 160–61, 102 S.Ct. at 3026 (agency preemption case examining the language of the authorizing statute); *cf. Medtronic, Inc.*, —— U.S. at ——, 116 S.Ct. at 2251–53 (statutory preemption case holding that congressional purpose may be found from the "language of the preemption statute," its surrounding "statutory framework," and "the structure and purpose of the statute as a whole" evident from its "basic purpose" and "legislative history"); *New York State Conference of Blue Cross*, —— U.S. at ——, 115 S.Ct. at 1677 (congressional intent in a statutory preemption case begins with the provisions of the statute in question, then turns to the structure and purpose of the act); *CSX Transp., Inc.*, 507 U.S. at 664, 113 S.Ct. at 1737 ("Evidence of pre-emptive purpose is sought in the text and structure of the statute at issue."). Thus, the court begins this portion of its analysis with the language and legislative history of the pertinent portions of the VSTA to see what they reveal about congressional intent to authorize agency preemption of claims like the Garrelts'.

 Like every recent decision to consider the extent of Congress's authorization of agency preemption under VSTA, this court's inquiry focuses, in the first instance, on the specific section of the act authorizing agency regulations, 21 U.S.C. § 154. That section of the statute provides as follows:

The Secretary of Agriculture is hereby authorized to make and promulgate from time to time *such rules and regulations as may be necessary to prevent the preparation, sale, barter, exchange, or shipment* as aforesaid *of any worthless, contaminated, dangerous, or harmful virus, serum, toxin,*

*or analogous product for use in the treatment of domestic animals* or otherwise to carry out this paragraph, and to issue, suspend, and revoke licenses for the maintenance of establishments for the preparation of viruses, serums, toxins, and analogous products, for use in the treatment of domestic animals, intended for sale, barter, exchange, or shipment as aforesaid.

21 U.S.C. § 154 (emphasis added). This court agrees with those decisions holding that the authorization "to make and promulgate from time to time such rules and regulations as may be necessary" is a congressional authorization for the agency to preempt state law. *See, e.g., Murphy,* 898 F.Supp. at 814 ("The United States Supreme Court has held that similar broad congressional grants bestow upon administrative agencies the authority to promulgate regulations pre-empting state law," citing *City of New York,* 486 U.S. at 66–67, 108 S.Ct. at 1643 (the FCC was authorized to "[m]ake such rules and regulations and prescribe such restrictions and conditions ... as may be necessary to carry out the provisions" of the communications laws); *de la Cuesta,* 458 U.S. at 160, 102 S.Ct. at 3026 (the FHLBB was "authorized, under such rules and regulations as it may prescribe, to provide for the organization, incorporation, examination, operation, and regulation" of federal savings and loan associations)). However, this court does not agree that this statutory language is a blanket authorization to preempt state law at will, but only an authorization to preempt state law *to the extent that it was Congress's intent that the agency act in a particular field.* This conclusion is the direct result of giving congressional intent its due weight, without deference to any agency interpretation of congressional intent, under the second prong of the *City of New York* inquiry, as this court interprets that prong. *City of New York,* 486 U.S. at 66, 108 S.Ct. at 1643 (citing *Louisiana Pub. Serv. Comm'n,* 476 U.S. at 374, 106 S.Ct. at 1901).

Thus, the court believes it would be a mistake to read this statutory provision in isolation from the statutory provision identifying the purpose of VSTA itself, 21 U.S.C. § 151, in both its original form and as amended in 1985. The codified provision stating Congress's purpose in passing the legislation in 1913 is as follows:

It shall be unlawful for any person, firm, or corporation to prepare, sell, barter, or exchange in the District of Columbia, or in the Territories, or in any place under the jurisdiction of the United States, or to ship or deliver for shipment from one State or Territory or the District of Columbia to any other State or Territory or the District of Columbia, any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product intended for use in the treatment of domestic animals, and no person firm, or corporation shall prepare, sell, barter, exchange, or ship as aforesaid any virus, serum, toxin, or analogous product manufactured within the United States and intended for use in the treatment of domestic animals, unless and until the said virus, serum, toxin, or analogous product shall have been prepared, under and in compliance with regulations prescribed by the Secretary of Agriculture, at an establishment holding an unsuspended and unrevoked license issued by the Secretary of Agriculture as hereinafter authorized.

21 U.S.C. § 151 (1913) (emphasis added). The logical reading of this provision is that Congress was motivated by a concern over the possible worthlessness, contamination, dangerousness, or harmfulness of animal vaccines *to domestic animals.* Indeed, a purpose to protect human health or the public health is not given direct expression anywhere in the 1913 act.

Other insights into Congress's purpose in enacting the original provisions of VSTA are few. *Animal Health Inst. v. United States Dep't of Agric.,* 487 F.Supp. 376, 378 (D.Colo. 1980) (stating, "The legislative history of the Virus–Serum–Toxin Act is extremely sparse," but finding such legislative history as existed confirmed the view that the 1913 act was not intended to regulate manufacturers who confined their activities to one state). However, such insights as exist confirm this court's reading of VSTA as motivated by an intent to protect the health of domestic animals, and their economic value, not human

health. One of the very few discussions of the purpose of the 1913 act comes from the United States District Court for the District of South Dakota in observations made sixty-seven years after passage of the VSTA:

> In the first part of the next decade [meaning the 1910s] farmers were suffering considerable losses as a result of the somewhat motley manufacture and distribution of anti-hog cholera serum. The Department of Agriculture apparently felt that the authorization to regulate animal drugs contained in the Food and Drug Act of 1906 did not provide adequate authority to regulate anti-hog cholera serum; the Department procured the passage of the VSTA in response to the anti-hog cholera serum problem. *See, Hall v. State,* 100 Neb. 84, 158 N.W. 362 (1916). The VSTA, then as now, provided for the regulation of animal biologicals shipped in interstate commerce, with no jurisdiction over biologics merely having a component that had passed through interstate commerce. Responsibility for its administration was placed with the Bureau of Animal Industry, a subdivision of the Department of Agriculture. Appropriations Act of March 4, 1917, Ch. 179, 39 Stat. 1138.

*Grand Labs., Inc. v. Harris,* 488 F.Supp. 618, 620 (D.S.D.1980), *aff'd,* 644 F.2d 729 (8th Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1972, 72 L.Ed.2d 442 (1982). This identification of the motivation for passage of the 1913 act cites much more nearly contemporaneous authority, the *Hall* decision from the Nebraska Supreme Court. In a decision rendered in 1916, just three years after the VSTA was enacted, the Nebraska Supreme Court wrote of the genesis of the act,

> The Department of Agriculture, realizing the losses that were resulting to the hog raisers of the country from the promiscuous manufacture and distribution of anti-hog cholera serum, secured the enactment of a law intended to regulate the preparation, sale, and distribution of such serum.... Act March 4, 1913, c. 145, 37 U.S. Stat. 832, 833.

*Hall v. State,* 100 Neb. 84, 158 N.W. 362, 363 (1916). These descriptions of the stimulus for passage of VSTA demonstrate that the worthlessness or dangerousness of vaccines *to livestock* was the motivation for congressional action. Thus, congressional intent, and consequently congressional authorization for preemption, in the VSTA was directed toward regulation of *animal health.*

Indeed, to the extent that there is any doubt as to whether Congress intended the VSTA to preempt causes of action based on *human* injury from animal vaccines, that doubt must be resolved against intent to preempt such claims. In the case of either statutory or agency preemption, there is a presumption that " 'the historic powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.' " *Medtronic, Inc.,* — U.S. at ——, 116 S.Ct. at 2250 (quoting *Rice,* 331 U.S. at 230, 67 S.Ct. at 1152); *Hillsborough County,* 471 U.S. at 715, 105 S.Ct. at 2376 (stating that the same presumption obtains when agency preemption is at issue). This court concluded above that, even in an agency preemption case, it is the manifest purpose of Congress, not of the agency, that determines whether the presumption has been rebutted. *See supra* at p. 1050. Among the historic police powers of the statutes are the power to protect the "health and safety of citizens," including their "lives, limbs, health, comfort, and quiet." *Medtronic, Inc.,* — U.S. at ——, 116 S.Ct. at 2245. Thus, the Garrelts' claim for human injury falls within the presumption. Furthermore, the presumption against preemption of claims for human injury has not been rebutted here, because the court finds something far less than a manifest congressional purpose to preempt the historic police power to protect health and safety of citizens in passage of the VSTA. The act, by its terms, does not state such an intention, and the only indications of legislative history suggest a narrow concern for *animal* safety motivated passage of the act. The question becomes whether the 1985 amendments somehow dramatically changed the purpose of VSTA such that congressional intent, and hence congressional authorization to the agency, to preempt claims like the Garrelts is apparent.

As amended in 1985, the "purpose" provision, 21 U.S.C. § 151, expanded the

VSTA's reach to include both interstate and intrastate manufacture and sale of animal vaccines. The amended section is as follows:

It shall be unlawful for any person, firm, or corporation to prepare, sell, barter, or exchange in the District of Columbia, or in the Territories, or in any place under the jurisdiction of the United States, or to ship or deliver for shipment *in or from the United States, the District of Columbia, any territory of the United States, or any place under the jurisdiction of the United States,* any worthless, contaminated, dangerous, or harmful virus, serum, toxin, or analogous product intended for use in the treatment of domestic animals, and no person, firm, or corporation shall prepare, sell, barter, exchange, or ship as aforesaid any virus, serum, toxin, or analogous product manufactured within the United States and intended for use in the treatment of domestic animals, unless and until the said virus, serum, toxin, or analogous product shall have been prepared, under and in compliance with regulations prescribed by the Secretary of Agriculture, at an establishment holding an unsuspended and unrevoked license issued by the Secretary of Agriculture as hereinafter authorized.

21 U.S.C. § 151 (1985) (emphasis added indicating changes from the 1913 version). A new section, 21 U.S.C. § 159, was also enacted in 1985 as part of the VSTA amendments. It provides as follows:

The procedures of sections 672, 673, and 674 of this title (relating to detentions, seizures and condemnations, and injunctions, respectively) shall apply to the enforcement of this chapter with respect to any product prepared, sold, bartered, exchanged, or shipped in violation of this chapter or a regulation promulgated under this chapter. The provisions (including penalties) of section 675 of this title shall apply to the performance of official duties under this chapter. Congress finds that (i) the products and activities that are regulated under this chapter are either in interstate or foreign commerce or substantially affect such commerce or the free flow thereof, and (ii) regulation of the products and activities as provided in this chapter is

necessary to prevent and eliminate burdens on such commerce and to effectively regulate such commerce.

21 U.S.C. § 159. Although judicial comment on the legislative history for these amendments is more extensive than that available for the original version of VSTA, this latter legislative history is still somewhat sparse.

The Seventh Circuit Court of Appeals accurately summarized this latter legislative history in *Lynnbrook Farms,* 79 F.3d at 625:

Prior to 1985, several courts held that the scope of VSTA, and hence the application of APHIS regulations, was limited to products made and sold in interstate commerce. In other words, VSTA did not grant the USDA and APHIS the authority to regulate animal vaccines manufactured and sold within an individual state. *See Animal Health Institute v. U.S. Dept. of Agriculture,* 487 F.Supp. 376 (D.Colo. 1980); *Grand Lab., Inc. v. Harris,* 644 F.2d 729 (8th Cir.1981), *cert. denied,* 456 U.S. 927, 102 S.Ct. 1972, 72 L.Ed.2d 442 (1982). In response, Congress amended VSTA in 1985 to clearly place both interstate and intrastate vaccines within the ambit of federal control. 21 U.S.C. § 151; S.Rep. No. 145, 99th Cong., 1st Sess. 338–39 (1985), reprinted in 1985 U.S.C.C.A.N. 1676, 2004–05. The amendments reflect the Congressional finding that federal regulation was "necessary to prevent and eliminate burdens on commerce and to effectively regulate such commerce." 21 U.S.C. § 159.

The legislative history supporting the VSTA amendments also evinces an unquestionable congressional intent to create national, uniform standards for the preparation and sale of animal vaccines. S.Rep. No. 145 at 339. Congress found that animal agriculture has "changed drastically" since the original 1913 passage of VSTA, including the development of "truly national markets." *Id.* It also noted that the industry recognized the need for national standards. *Id.* Congress thus concluded that uniform, federal standards would better serve livestock owners, veterinarians, and the American public. *Id.*

*Lynnbrook Farms*, 79 F.3d at 625; *accord Lynnbrook Farms*, 887 F.Supp. at 1103 (lower court's decision also identifying legislative history expressed in S.Rep. No. 145); *Brandt*, 540 N.W.2d at 875–76 (same); *see also* S.Rep. No. 145, 99th Cong., 1st Sess.

338–39 (1985), reprinted in 1985 U.S.C.C.A.N. 1676, 2004–05;[25] 131 Cong. Rec. H12499–02 (comments of Mr. Garza, Rep. Texas) (conference report on the Food Security Act of 1985, H.R. 2100, which included amendments to VSTA, in which Mr.

25. The pertinent portions of S.Rep. 145 are as follows:

The bill would clarify and update the Virus–Serum–Toxin Act of 1913 (the 'VST Act'), the statutory authority for U.S. Department of Agriculture regulation of animal vaccines and related products.

USDA's Animal and Plant Health Inspection Service ('APHIS') has a long and successful history of assuring livestock owners, veterinarians, and the American public that there is an ample supply of safe and effective animal vaccines and other biological products. APHIS carries out its responsibilities pursuant to the VST Act.

But legislation designed to serve the interest of animal agriculture more than seven decades ago has been overtaken by modern events, due to the VST Act's archaic concepts of authority for a federal regulatory agency, as compared to modern statutes.

Two recent federal court decisions have created confusion and concern among the producers of animal biological products and those who utilize them. The thrust of these decisions is that USDA has primary regulatory authority over finished products physically moving in interstate commerce, but all other products, such as those made and sold within a single state, are subject only to Food and Drug Administration jurisdiction. These 'intrastate' products are not subject to USDA licensure, and FDA has, so far, not asserted its authority over them in a comprehensive manner. In the meantime, 'interstate' products remain firmly under the jurisdiction of USDA.

The narrow 'intrastate' versus 'interstate' distinction found in the VSTA Act no longer exists for any class of comparable products. Federal laws make no such distinctions for human-use pharmaceuticals, animal drugs, food additives, color additives, medical devices, processed food, meat and poultry products, or pesticides; all are subject to uniform federal regulatory standards, whether they cross state lines or not.

Animal agriculture has changed drastically since 1913. One major alteration in the industry is the tremendous increase in interstate movement of animal and animal-derived foods. There are truly national markets for the live animals and their products, while USDA's animal vaccine regulatory program is compelled by law to maintain an artificial distinction between 'intrastate' and 'interstate' commerce in the products used to treat these animals.

The need for uniform national standards has become recognized widely in recent years.

The major national livestock producer groups support these amendments, as does the Veterinarians' National Association. Furthermore, a number of states have enacted rules permitting only USDA-licensed animal vaccines to be sold or used within their borders.

According to a recent USDA survey, at least 15 states now routinely require that animal biologic products used within their boundaries be licensed by USDA, although some of these states permit certain types of unlicensed vaccines under limited special circumstances. These states are Alabama, Colorado, Florida, Hawaii, Idaho, Louisiana, Michigan, Minnesota, Mississippi, Montana, New York, Oklahoma, Pennsylvania, Utah and Wyoming. When the Oklahoma State Board of Agriculture adopted an 'emergency regulation' to this effect in 1981, its justification was 'an imminent peril to the public welfare.' USDA found that only two states, California and South Dakota, actively regulate 'intrastate' animal biologics. It must be assumed, therefore, that 'intrastate' animal biologic products are almost entirely free of any official scrutiny in the remaining 33 states.

USDA can effectively control the movement of diseased animals and contaminated food of animal origin through court-authorized seizure and injunctive powers. However, the VST Act presently does not give the department these essential means for the control of animal vaccines and related products. Expanded regulatory authority for USDA would be meaningless, if the department did not have the tools needed to bring about compliance. Presently, the only enforcement tool is a criminal misdemeanor prosecution. The bill would give USDA powers comparable to those available to regulate commerce in animals and animal-derived foods such as detention and court-ordered seizure and injunction.

The bill provides licensing exemptions for animal owners and veterinarians, who could continue to produce unlicensed vaccines for use in animals under their care (although enforcement actions against unsafe or ineffective products would be authorized). Biologics produced in states that have adequate testing/regulatory programs could continue to be marketed 'intrastate' under those state programs without USDA licensing. In addition, all other 'intrastate' manufacturers would have four years from the date of enactment to phase into the USDA licensing system.

S.Rep. No. 145, 99th Cong., 1st Sess. 338–39 (1985), reprinted in 1985 U.S.C.C.A.N. 1676, 2004–05.

Garza stated, "H.R. 2100 modernizes the Federal Virus–Serum–Toxin Act, a law which regulates veterinary biologics, to give the Agriculture Department control over intrastate as well as interstate sales (giving producers of intrastate products up to 4 years to comply with Federal regulations), but would allow States which have effective regulatory systems to retain them.").

This court finds nothing about the expansion of VSTA to regulate intrastate manufacture and sale of animal vaccines as well as interstate manufacture and sale that expressly requires expansion of VSTA into the regulation of *human health risks* from such vaccines. Instead, the legislative history indicates that in making the 1985 amendments, Congress only intended to extend to "intrastate" vaccines the regulatory authority it had already given the agency with regard to "interstate" vaccines. S.Rep. No. 145, 99th Cong., 1st Sess. 338–39 (1985), reprinted in 1985 U.S.C.C.A.N. 1676, 2004–05; 131 Cong. Rec. H12499–02 (comments of Mr. Garza, Rep. Texas). As the court observed with regard to the 1913 version of 21 U.S.C. § 151, congressional intent, and consequent agency authority, extended only to preemption of state regulation of vaccines to address *animal health. Grand Labs., Inc.,* 488 F.Supp. at 620; *Hall,* 100 Neb. at 84, 158 N.W. at 363. In other words, the court cannot find that Congress ever expressly committed to the agency · policy decisions concerning regulation of human health risks from animal vaccines.

The court recognizes, however, that no such express authorization is required. *See, e.g., City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642 (" '[a] pre-emptive regulation's force does not depend on express congressional authorization to displace state law,'" quoting *de la Cuesta,* 458 U.S. at 154, 102 S.Ct. at 3023). However, this court also finds that nothing about the expansion of VSTA to regulate intrastate manufacture and sale of animal vaccines as well as interstate manufacture and sale *necessarily* or *implicitly* indicates congressional intent to expand the agency's authority under VSTA to preempt state regulation of human health risks from animal vaccines. SBC argues that APHIS has interpreted its role in regulating

commerce in animal vaccines, in the absence of clear statements by Congress on the matter, as granting it the authority to preempt state causes of action founded on either human or animal safety. SBC further contends that this is an agency interpretation entitled to deference under *Chevron.* Yet, what this court holds to be the prerequisites for any deference to the agency under *City of New York* have not yet been, and the court finds cannot be, established in this case. However, before turning to that precise matter, the court deems it instructive to compare the implications of congressional intent, and hence of authorization, or the lack thereof, in this case to those in at least some of the pertinent Supreme Court precedents.

In *City of New York,* the Court looked not only at the specific language of the authorizing statute, but at the implications of the legislative history of that statute. *City of New York,* 486 U.S. at 66–67, 108 S.Ct. at 1643–44. The court found the authorizing statute mirrored a decade of agency regulatory policy, and the legislative history produced specific indications that Congress intended the agency's policy of preemption to continue. *Id.* at 67–68, 108 S.Ct. at 1643–44. In the present case, we have nothing like a decade of regulatory policy endorsed by silence or explicit comment; we have instead brand new amendments with "sparse" legislative history authorizing agency regulation in a new area, intrastate animal vaccines. The parties have produced no judicial decision, excerpt from the legislative history, or any APHIS policy statements or regulations, indicating that at any time prior to 1985, APHIS had asserted authority, or been recognized to have the authority, to preempt state causes of action based on injury to humans. Congress here has not acquiesced in a de facto policy of agency preemption of the kind of claim asserted by the Garrelts. Furthermore, the legislative history of the 1985 amendments added *intrastate* vaccines into existing regulatory policy, not *interstate* ones. If state causes of action based on injuries to human health posed a burden to interstate · commerce, that burden should have been apparent under the prior regulato-

ry regime, which addressed only interstate vaccines.

In *de la Cuesta,* the Court found that the authorizing statute gave the agency "plenary" authority to issue the regulations in question, because the authorizing statute specified each of the areas in which the challenged preemptive regulations had been promulgated. *de la Cuesta,* 458 U.S. at 160–61, 102 S.Ct. at 3026. Here, the authorizing statute does state that the agency is to regulate "commerce," 21 U.S.C. § 159, and furthermore, does identify other areas committed to the agency's care, including harmfulness and dangerousness, 21 U.S.C. § 151, which SBC seems to assert should be read broadly to include harmfulness and dangerousness to humans. However, the statute's reference to harmfulness and dangerousness must be read in the legislative context to refer to harmfulness and dangerousness *to animals. Grand Labs., Inc.,* 488 F.Supp. at 620; *Hall,* 100 Neb. at 84, 158 N.W. at 363. Furthermore, worthlessness and contamination, to which dangerousness and harmfulness are linked without grammatical distinction in the statute, most logically would relate to animal health, not human health. Thus, there is no "plenary" authorization for agency preemption of claims for human injury in this case. Although Congress showed itself aware of the dangers to animal health posed by unregulated vaccines, and the burdens on commerce even "intrastate" animal vaccines might represent if unregulated, it does not appear from anything in the statutory language or legislative history that Congress ever contemplated or committed to the agency federal regulation of human health concerns posed by animal vaccines.[26]

Not only are these precedents distinguishable in their implications of congressional intent, but the Supreme Court's recent decision in *Medtronic* casts doubt on any implication of congressional intent that agency regulations should preempt claims for human

injury, even if Congress intended, and hence authorized, the agency to preempt other state regulation that posed impediments to commerce. In *Medtronic,* the Court considered a statute, rather than an agency pronouncement, that forbade any "requirement" that altered incentives or imposed duties "different from, or in addition to" the standards promulgated by the responsible agency. *Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2251. The company defendant argued that the plain language of the statute preempted *any and all* common-law claims brought by an injured plaintiff against a manufacturer of medical devices. *Id.* A plurality of the Court found Medtronic's argument "is not only unpersuasive, it is implausible." *Id.*

Under Medtronic's view of the statute, Congress effectively precluded state courts from affording state consumers any protection from injuries resulting from a defective medical device. Moreover, because there is no explicit private cause of action against manufacturers contained in the MDA, and no suggestion that the Act created an implied private right of action, Congress would have barred most, if not all, relief for persons injured by defective medical devices. *Medtronic's construction of § 360k would therefore have the perverse effect of granting complete immunity from design defect liability to an entire industry that, in the judgment of Congress, needed more stringent regulation in order "to provide for the safety and effectiveness of medical devices intended for human use,"* 90 St. 539 (preamble to Act). *It is, to say the least, "difficult to believe that Congress would, without comment, remove all means of judicial recourse from those injured by illegal conduct,"* Silkwood v. Kerr–McGee Corp., 464 U.S. 238, 251, 104 S.Ct. 615, 623, 78 L.Ed.2d 443 (1984), *and it would take language much*

---

**26.** Thus, in this court's reading, APHIS's authority to regulate vaccines for Newcastle Disease and rabies, which are admittedly diseases dangerous to humans, stems from the fact that those viruses are also dangerous to livestock. Another distinction between these two diseases, dangerous to both humans and livestock, and the danger to humans the Garrelts allege Ultrabac 7 poses if

accidentally self-injected, is that APHIS has required that manufacturers supply information concerning the presence of the Newcastle and rabies antigens, while it has required, and apparently received, no information from manufacturers concerning other kinds of health risks to humans posed by animal vaccines if accidental self-inoculation occurs.

*plainer than the text of § 360k to convince us that Congress intended that result.*

*Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2251. Here, SBC's (and APHIS's) interpretation of agency authority would have the perverse effect of granting complete immunity from claims based on injury to humans for an entire industry that, in the judgment of Congress, also needed more stringent regulation. The perversity of such an effect is heightened by the fact that the motivation for VSTA, as enacted in 1913 and not in that respect altered by the 1985 amendments, is the protection of animal health, not human health. *Grand Labs., Inc.,* 488 F.Supp. at 620; *Hall,* 100 Neb. at 84, 158 N.W. at 363. In this case, the perverse effect of claim immunity spills so far beyond the motivations for and resulting purview of the statute as to defy reasonable belief that such an effect was intended.

The plurality in *Medtronic* also examined the legislative history of the MDA, and found that "when Congress enacted § 360k, it was primarily concerned with the problem of specific, conflicting State statutes and regulations rather than the general duties enforced by common-law actions." *Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2252. Again, when Congress first passed the VSTA, and when it amended it to extend federal control to "intrastate" as well as "interstate" animal vaccines, it is apparent that Congress's concern was regulation of the worthlessness, contamination, dangerousness, or harmfulness of animal vaccines to *livestock,* not the general duties of product manufacturers, enforced by common-law actions, to safeguard human users of their products with adequate warnings concerning proper use, dangers of self-inoculation, and appropriate emergency treatment in the case of accidental self-inoculation.

The plurality in *Medtronic* also confronted an argument, similar to that offered here by SBC concerning the import of Congress's concern to unburden commerce. The argument in *Medtronic* was that the intent behind the MDA was at least in part to protect innovations in device technology from being stifled by unnecessary restrictions, and that this interest extended to the preemption of common-law claims, even in light of the express purpose of the act " 'to provide for the safety and effectiveness of medical devices intended for human use.' " *Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2252–53 (quoting 90 Stat. 539). The plurality rejected such an argument:

> While the Act certainly reflects some of these concerns, the legislative history indicates that any fears regarding regulatory burdens were related more to the risk of additional federal and state regulation rather than the danger of preexisting duties under common law.... Indeed, nowhere in the material relating to the Act's history have we discovered a reference to a fear that product liability actions would hamper the development of medical devices. To the extent that Congress was concerned about protecting the industry, that intent was manifested primarily through fewer substantive requirements under the Act, not the pre-emption provision; furthermore, any such concern was far outweighed by concerns about the primary issue motivating the MDA's enactment: the safety of those who use medical devices.

*Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2253 (citations omitted). The plurality reviewed the legislative debates, hearings, and committee reports, and found nothing indicating "any proponent of the legislation intended a sweeping pre-emption of traditional common-law remedies against manufacturers and distributors of defective devices," and Congress's failure to hint at such an intent was "spectacularly odd" in light of ongoing litigation. *Id.*

In the present case, SBC argues that the congressional intent to unburden commerce in animal vaccines extends to the preemption of common-law claims for human injury from such vaccines. In this case, the rather limited legislative history suggests that the VSTA was enacted out of concern for a lack of uniform regulation [27] as interfering with com-

---

27. As to the 1985 amendments, the concern to add "intrastate" vaccines to the regulatory scheme was a concern over the lack of *any* official regulation of such vaccines, not just a

merce rather than a fear of the danger of preexisting duties under the common law. Furthermore, nowhere in the material relating to the history of the 1985 amendments to VSTA has the court discovered a reference to a fear that product liability actions based on injuries to humans would hamper the development of commerce in animal vaccines. To the extent that Congress was concerned about protecting the animal vaccine industry from burdens on commerce, that intent was manifested primarily through bringing all such vaccines, "intrastate" and "interstate," under the same standards relating to *animal* safety. 21 U.S.C. § 151 (1985) (including "intrastate" vaccines within the ambit of the VSTA); *Grand Labs., Inc.*, 488 F.Supp. at 620 (VSTA was motivated by a concern for animal safety); *Hall,* 100 Neb. at 84, 158 N.W. at 363 (same). As in *Medtronic,* this court has found nothing in the legislative history of the 1985 amendments indicating that any proponent of extension of VSTA to "intrastate" vaccines "intended a sweeping preemption of traditional common-law remedies" against manufacturers and distributors of animal vaccines for failure to warn of human health hazards from self-inoculation, and Congress's failure to hint at such an intent is "spectacularly odd" in light of what would amount to a fundamental shift in the effect of the legislation, not simply its scope. *Id.*

#### c. Are the Garrelts' claims preempted?

This court finds no indication of congressional intent, either expressed or implied, for agency regulations under VSTA to preempt common-law claims based on failure to warn of the dangers to humans of self-inoculation from animal vaccines. Thus, even if APHIS intended to preempt such claims, thereby satisfying the first prong of the *City of New York* inquiry, APHIS's action was not authorized by Congress, as required under the second prong of that inquiry, and agency preemption of such claims therefore is not permitted. *City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642. This simply is not a case in which the agency should be accorded any deference, because it may determine that its

authority is exclusive and preempts any state efforts to regulate claims for *human* injury. *Id.* To the contrary, the "proper circumstances" for such an agency determination have not been met, because this court finds no indication that Congress granted APHIS the broad authority to reconcile conflicting policies of burdens on commerce and claims for injury to humans. *Id.* The latter policy was never committed to the agency's care.

█ Yet, even were this court persuaded that both burdens on commerce and concerns about human health were policies committed to the care of APHIS under the VSTA, and this court were therefore required to accord deference to APHIS's determination to preempt human injury claims, this court would find APHIS's regulations no bar to the claims presented in this case. In order to sustain the bar of agency preemption, "the agency's choice to pre-empt [must] 'represent a *reasonable accommodation* of conflicting policies that were committed to the agency's care by the statute.'" *Id.* (quoting *Shimer,* 367 U.S. at 383, 81 S.Ct. at 1560). A complete bar on preexisting common-law duties to warn of the dangers to humans of use of any product is not reasonable as a means to unburden commerce for a number of reasons. First, the court knows of no jurisdiction in which this general duty does not exist; hence, there can be no argument that the duty imposed is not a "nationwide" one already that poses no real burden to interstate commerce, or any derogation from uniform national standards. Second, the Garrelts' regulatory vacuum argument has some import. If the agency intends to preempt all such claims for human injury, it is not reasonable for the agency to fail either to promulgate regulations requiring manufacturers to provide information concerning the need for warnings of human health concerns with particular vaccines, or itself to make any evaluation of such a need as a general matter in the industry. Indeed, although the regulations promulgated by the agency require the inclusion of warnings and cautions "appropriate" for a particular animal vaccine, 9

lack of uniform regulation, in a majority of the states. S.Rep. No. 145, 99th Cong., 1st Sess.

338–39 (1985), reprinted in 1985 *U.S.C.C.A.N.* 1676, 2004–05.

C.F.R. § 112.2(a)(5) (requiring "[f]ull instructions for the proper use of the product, including ... warnings, cautions...."), there is no indication that APHIS has ever considered whether warnings concerning self-inoculation or other potential human harms were "appropriate." Third, as *Medtronic* counsels, it is not reasonable to wipe out an entire category of claims based on pre-existing common-law duties in an entire industry in the interest of unburdening that industry, even if the goal is uniform, nationwide regulation, when there is no hint from Congress that such a sweeping change was contemplated. *Medtronic, Inc.,* —— U.S. at ——, 116 S.Ct. at 2253.

Finally, the court is not persuaded that Congress would have sanctioned such sweeping agency preemption in light of the statute and its legislative history. *City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642 (agency's choice will not be accorded deference if it is not one that Congress would have sanctioned, based on the statute and its legislative history). VSTA was intended to improve the effectiveness and safety of animal vaccines when it was originally passed in 1913, *Grand Labs., Inc.,* 488 F.Supp. at 620 (VSTA was motivated by a concern for animal safety); *Hall,* 100 Neb. at 84, 158 N.W. at 363 (same), and the court finds nothing in the legislative history or language of the 1985 amendments that changed that focus. With such congressional intent as the basis for the statute, the court deems it unlikely in the extreme that Congress would have sanctioned agency preemption of all common-law claims based on injury to humans.

Thus, the court concludes, as to the question posed by SBC's summary judgment motion, which is whether APHIS regulations preempt tort claims like the Garrelts' for human injury, the answer is "no."

## C. Certification For Interlocutory Appeal

Although neither party has requested it, the court concludes that it should *sua sponte* grant SBC leave to pursue an interlocutory appeal of this order pursuant to 28 U.S.C. § 1292(b).[28] That statute provides, in pertinent part, as follows:

> (b) When a district judge, in making in a civil action an order not otherwise appealable under this section, shall be of the opinion that such order involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from the order may materially advance the ultimate termination of the litigation, he shall so state in writing in such order. The Court of Appeals which would have jurisdiction of an appeal of such action may thereupon, in its discretion, permit an appeal to be taken from such order, if application is made to it within ten days after the entry of the order: *Provided, however,* That application for an appeal hereunder shall not stay proceedings in the district court unless the district judge or the Court of Appeals or a judge thereof shall so order.

28 U.S.C. § 1292(b). As the Eighth Circuit Court of Appeals has observed, the statute provides for certification of controlling questions of law by the district court for interlocutory appeal in circumstances where an appeal is otherwise unavailable. *City of Fort Madison, Iowa v. Emerald Lady,* 990 F.2d 1086, 1088 n. 4 (8th Cir.1993). However, the appellate court must, upon certification, decide, in its discretion, whether to permit the appeal on the question certified. *Id.*[29]

**28.** This court's reading of the plain language of the interlocutory appeal statute, that if the court "shall be of the opinion that such order" meets the criteria of the statute, it may certify the matter for interlocutory appeal, 28 U.S.C. § 1292(b), is that the statute grants the district court the authority to make the necessary certification for interlocutory appeal *sua sponte.*

**29.** Because § 1292(b) provides for appeal of orders otherwise unappealable, and thus provides an avenue for resolving disputed and controlling questions of law, the resolution of which will materially further the litigation, the appellate court reviews *de novo* the questions of law certified by the district court. *Simon v. G.D. Searle & Co.,* 816 F.2d 397, 400 (8th Cir.), *cert. denied,* 484 U.S. 917, 108 S.Ct. 268, 98 L.Ed.2d 225 (1987). The nature and scope of the appellate court's review is not rigidly determined by the certified questions, however. *Id.* (citing *In re Oil Spill by the Amoco Cadiz,* 659 F.2d 789, 793 n. 5 (7th Cir.1981). The appellate court

> remain[s] free to consider " ' "such questions as are basic to and underlie" ' " the questions certified by the district court. [*In re Oil Spill.*

In a recent decision, the Eighth Circuit Court of Appeals considered the standards applicable to an interlocutory appeal pursuant to § 1292(b). *See White v. Nix,* 43 F.3d 374 (8th Cir.1994). The court held that "[t]he requirements of § 1292(b) are jurisdictional," and the statute should be used with care to avoid piece-meal appeals. *White,* 43 F.3d at 376. Thus, the court. stated that § 1292(b) " 'should and will be used only in exceptional cases where a decision on appeal may avoid protracted and expensive litigation, as in antitrust and similar protracted cases.' " *Id.* (quoting S.Rep. No. 2434, 85th Cong., 2d Sess. (1958), reprinted in 1958 U.S.C.C.A.N. 5255, 5260). Thus, the statute should be used "sparingly" and the burden, on the movant, is a heavy one to show that the case is an "exceptional" one in which immediate appeal is warranted. *Id.* Nonetheless, the court's grant of interlocutory appeal is reviewed for abuse of discretion. *Id.* (finding abuse of discretion in that case in failure to consider whether the appeal involved a controlling question of law.). The court therefore reiterated that § 1292(b) establishes three criteria that must be met for certification by the court: "the district court must be 'of the opinion that' (1) the order 'involves a controlling question of law'; (2) 'there is substantial ground for difference of opinion'; and (3) certification will 'materially advance the ultimate termination of the litigation.' " *Id.* at 377.

The court is of the opinion that this decision presents an "exceptional case" in which immediate interlocutory appeal should be permitted. *Id.* This court is of the opinion that this order involves a controlling question of law, specifically, whether the Garrelts' state-law claims have been preempted by APHIS regulations. *Id.* It is also clear to the court that "there is substantial ground for difference of opinion," *id.,* since no court has yet decided the preemption issue as regards human injury, and all of the decisions to address the preemptive effect of APHIS

regulations on other kinds of state-law claims have found that the regulations properly preempted state law. Finally, certification will "materially advance the ultimate termination of the litigation," *id.,* because, if this court is incorrect in its conclusion that the Garrelts' claims are not preempted, SBC is entitled to immediate summary judgment terminating the case. This matter will therefore be certified for interlocutory appeal pursuant to 28 U.S.C. § 1292(b) on the question of whether the Garrelts' state-law claims are preempted by APHIS regulations. However, this court will not enter any stay of the proceedings in this case while such an interlocutory appeal is pending. 28 U.S.C. § 1292(b).

## V. CONCLUSION

The court deems it useful briefly to recapitulate the steps leading it to the conclusion that the Garrelts' claims for human injury are not preempted by APHIS regulations, and hence requiring the court to deny SBC's motion for summary judgment. First, in order to determine whether APHIS regulations could preempt the Garrelts' common-law claims, the court had to establish what, if any, deference was due a determination by the agency that it had such preemptive power. Although this court's view is admittedly contrary to that of a number of other courts, a thorough review of the Supreme Court's decision in *City of New York* and other Supreme Court decisions dealing with agency preemption has led this court to conclude that, as a general rule, no deference is due the agency's determination to preempt state law. Rather, in only very narrow circumstances is the agency accorded any deference at all. Those narrow circumstances arise . only where (1) Congress confers on the agency "a broad grant of authority to reconcile conflicting policies," *and* (2) the agency's . choice to preempt "represents a *reasonable* accommodation *of conflicting policies that were committed to the agency's care by the*

by the *Amoco Cadiz,* 659 F.2d at 793 n. 5] (quoting *Helene Curtis Indus., Inc. v. Church & Dwight Co.,* 560 F.2d 1325, 1335 (7th Cir.1977) (quoting 9 J. Moore, *Moore's Federal Practice* ¶ 110.25[1], at 270)); *Merican, Inc. v. Caterpillar Tractor Co.,* 713 F.2d 958, 962 n. 7 (3d

Cir.1983), *cert. denied,* 465 U.S. 1024, 104 S.Ct. 1278, 79 L.Ed.2d 682 (1984); *United States v. Connolly,* 716 F.2d 882, 885 (Fed.Cir. 1983), ' *cert. denied,* 465 U.S. 1065, 104 S.Ct. 1414, 79 L.Ed.2d 740 (1984). *Simon,* 816 F.2d at 400.

*statute*" authorizing the agency to act. *See City of New York,* 486 U.S. at 64, 108 S.Ct. at 1642 (emphasis added). Even in these circumstances, however, even an agency's "reasonable" accommodation of preemption may be disturbed if " 'it appears from the statute or its legislative history that the accommodation is not one that Congress would have sanctioned.' " *Id.* (quoting *Shimer,* 367 U.S. at 383, 81 S.Ct. at 1560).

Next, the court concluded that prior decisions considering APHIS's authority to preempt state law were either unpersuasive or inapplicable, because they either did not properly apply the *City of New York* analysis, as interpreted by this court, or did not involve claims for *human* injury, or both. Thus, the court was compelled to embark on its own analysis of the preemptive effect of APHIS regulations on the Garrelts' state-law claims. In the first prong of that analysis, the court found that APHIS did indeed expressly state its intention to preempt even claims for human injury resulting from the manufacture or use of animal vaccines. First, APHIS stated its intention to preempt requirements, including state-law claims, imposing requirements "different" from or "additional" to those imposed by the agency, and claims for injuries to humans would impose such different or additional requirements. Second, APHIS stated its intention to preempt claims based on a need to protect animal or *human* health and safety. Although APHIS left open the door for state-law claims for damages for noncompliance with agency regulatory standards, which this court found authorized so-called "bad batch" claims, the Garrelts made no such claims.

It was upon the second prong of the *City of New York* analysis, examination of whether the agency's action was authorized by Congress, that this court found agency preemption of the claims in this case foundered. Although the court found congressional authorization to preempt state law in 21 U.S.C. § 154, this court did not agree that the language of this statutory provision authorized agency preemption of state law at will, but only constituted an authorization to preempt state law to the extent that it was Congress's intent that the agency act in a particular

field. Thus, the court read the preemption authorization of § 154 in conjunction with the purpose provision of VSTA, 21 U.S.C. § 151, and looked at that purpose in light of original passage of VSTA in 1913, and in light of amendments in 1985. Section 151, as originally enacted, this court found, indicated that Congress was motivated by a concern over the possible worthlessness, contamination, dangerousness, or harmfulness of animal vaccines *to domestic animals.* Nowhere in the statute is there any express statement of a purpose to protect human health. The few insights into Congress's original intent in passing VSTA confirmed this interpretation, because they demonstrated that the stimulus for passage of VSTA was the worthlessness or dangerousness of vaccines *to livestock* in the face of a hog cholera epidemic. Thus, this court concluded, congressional intent, and consequently congressional authorization for preemption, in the VSTA was directed toward regulation of *animal health.* In light of any doubt on the subject, the court concluded that the presumption against preemption of historic state powers to regulate health and safety weighed against finding congressional authorization to preempt claims for injury to human health.

This court found nothing in the 1985 amendments to VSTA altering this conclusion, based on the purpose of VSTA and consequent congressional authorization for preemption. Nothing about expansion of VSTA to regulate intrastate manufacture and sale of animal vaccines as well as interstate manufacture and sale either expressly or implicitly requires expansion of VSTA into the regulation of human health risks from such vaccines. An authorization to regulate commerce in the vaccines, this court concludes, cannot be parlayed into an authorization to preempt state claims for injuries to humans. The Supreme Court's decision in *Medtronic* counsels against giving such an expansive reading to congressional authorization.

Thus, although the first prong of the *City of New York* analysis was satisfied, the second prong was not, and the agency was entitled to no deference for its contrary conclusion, because the prerequisites for such deference had not been met. The court

found no broad authority for APHIS to reconcile conflicting policies of unburdening commerce and protection from injury to humans, because the latter policy was never committed to the agency's care. Even were the court persuaded that both burdens on commerce and concerns about human health were policies committed to the care of APHIS under VSTA, the court finds that, even affording the agency the deference it would then be due, APHIS's regulations pose no bar to the Garrelts' claims. The court finds APHIS's accommodation is not "reasonable," because, *inter alia*, it wipes out an entire category of claims based on pre-existing common-law duties in an entire industry in the interest of unburdening that industry, when Congress gave no hint of such an intention. In light of the statute and its legislative history, the court is not persuaded that Congress would have sanctioned such sweeping agency preemption. The intent of VSTA was the protection of animal health in 1913, and remained so after amendments in 1985; thus, with such congressional intent as the basis for the statute, the court deems it unlikely in the extreme that Congress would have sanctioned agency preemption of all common-law claims based on injury to humans.

SBC's motion for summary judgment, based on the preemption of the Garrelts' claims for human injury by APHIS regulations, is therefore **denied**. However, finding that, in this court's opinion, this decision involves a controlling question of law as to which there is substantial ground for difference of opinion, and that certification will materially advance the ultimate termination of the litigation, the court **certifies this decision for interlocutory appeal** pursuant to 28 U.S.C. § 1292(b) on the question of whether the Garrelts' state-law claims are preempted by APHIS regulations.

**IT IS SO ORDERED.**